## COMMONWEALTH *VS*. CARMEN ALVAREZ.

Hampden. September 12, 2000. - December 21, 2000.

Present: MARSHALL, C.J., ABRAMS, GREANEY, IRELAND, SPINA, COWIN, & SOSMAN, JJ.

*Practice, Criminal,* Assistance of counsel, New trial. *Constitutional Law,* Assistance of counsel.

A Superior Court judge did not err or abuse his discretion in allowing a criminal defendant's motion for a new trial based on an assertion of ineffective assistance of counsel, where counsel failed to review and provide to the defense expert medical records detailing a significant medical history that appeared to have contributed to the mental disease or defect raised as a defense, where there was no reasonable strategic basis for the failure, and where proper review of the records could have had a significant impact on the jury's assessment of the evidence. [100-104]

INDICTMENTS found and returned in the Superior Court Department on May 19, 1993.

The cases were tried before *James P. Dohoney,* J., and a motion for a new trial, filed on January 9, 1998, was heard by *Francis R. Fecteau,* J.

*Thomas H. Townsend,* Assistant District Attorney, for the Commonwealth.

*Myles D. Jacobson* for the defendant.

SOSMAN, J. After her conviction of murder in the first degree and assault and battery by means of a dangerous weapon, and while her appeal to this court was pending, the defendant filed a motion for a new trial based on ineffective assistance of counsel. We remanded the motion to the Superior Court. After a three-day evidentiary hearing, the motion judge[1] granted the defendant's motion. The Commonwealth has now appealed. We affirm the motion judge's order granting the defendant a new trial.

1. *Background.* We summarize the relevant facts. On April 8, 1993, the defendant went to Bernard's Café in Holyoke. The

---

[1]The motion judge was not the trial judge.

defendant became argumentative with another patron and with the bartender, Susan Brown. Despite repeated warnings, the defendant persisted in trying to solicit drinks from other customers, in violation of the bar's rules. Ultimately, Brown and a bouncer escorted the defendant outside. The defendant returned shortly thereafter to retrieve her jacket from behind the bar, and resumed an argument with Brown and the bouncer. The victim, Jose Correa, who had previously bought the defendant a beer, attempted to help get the defendant off the premises by offering to buy her a couple of beers somewhere else if she left Bernard's. The defendant pushed him away and told him to wait while she got her brother. As Correa turned away, the defendant took out a folding knife and stabbed him.

The defendant was indicted on May 19, 1993, and counsel was appointed to represent her. Counsel retained Dr. Bernard Katz, a forensic psychiatrist, to evaluate the defendant. Dr. Katz provided counsel with his report, dated May 12, 1994, in which he referenced the defendant's history of psychiatric disturbances, including her reports of hallucinations and voices. Those claimed hallucinations included seeing the victim in her jail cell. She also had various delusions, including "the active delusion that the police department is against her and that some type of plot has been concocted since she didn't think that she really has killed anyone." The defendant also had a lengthy history of severe alcohol and substance abuse, and her psychotic disorder was exacerbated when under the influence of alcohol.

As part of her history, the defendant also reported to Dr. Katz that she had been in a serious automobile accident in 1985, following which she had been in a coma for six months. She told Dr. Katz that, while in her coma, she had seen and talked to God and had seen her sister's suicide. She also reported that she had a "metal plate" put in her head as a result of the 1985 accident.

Dr. Katz's report made repeated reference to the fact that the defendant was a "poor historian," making it difficult to get a reliable picture of her background:

> "Ms. Alvarez's personal history is somewhat garbled since the patient is a very poor historian. In her prior workups that were included in the material you sent me, the history of this woman as obtained by other evaluators was similarly vague.

"" . . . .

·"As noted in earlier reports, the patient was a poor historian and was vague and contradictory throughout much of the interview. She found it difficult to focus as fully as necessary. She showed looseness of association, circumstantial and tangential thinking patterns, preoccupation with suicide, and active auditory and visual hallucinations. She was also delusional."

After his examination of the defendant and his review of some materials from other evaluators, Dr. Katz diagnosed the defendant with "[m]ixed psychotic disorder with organic, paranoid, and affective features." Noting that the defendant had, notwithstanding the severity and duration of her psychiatric illness, never received any active treatment and that she had only been placed on antipsychotic medications while in jail awaiting trial, Dr. Katz opined that the defendant was not presently competent to stand trial, but that more aggressive antipsychotic medication might render her competent in the future.[2] He further opined that the defendant was not criminally responsible for her actions at the time of the stabbing because of her underlying psychotic disorder, a disorder that had been further exacerbated by alcohol on the night in question.

Based on Dr. Katz's report, defense counsel filed a notice of intent to rely on a defense of lack of criminal responsibility because of a mental disease or defect.

At no time prior to trial did defense counsel obtain or provide to Dr. Katz any of the hospital records concerning the treatment of the defendant for the injuries she claimed to have sustained in her 1985 automobile accident. Shortly before trial, the Commonwealth's expert, Dr. Martin Kelly, asked to review the records of that 1985 hospitalization. After consultation with defense counsel, the prosecution requested a court order to obtain the records from Baystate Medical Center. The court issued such an order on September 15, 1994, noting that the record request was "[a]llowed by agreement." The records, a stack of papers approximately one foot high, were delivered to the clerk's office on September 21, 1994, the day before jury selection began. The prosecutor called defense counsel, advising him that the

---

[2]Trial did not commence until September 22, 1994. It does not appear that any issue of competency was raised at that time.

records had arrived and that they were quite voluminous. The prosecutor reviewed only the five-page discharge summary, and he sent that discharge summary to defense counsel and to the Commonwealth's expert witness later that same day. Defense counsel did not provide Dr. Katz with the discharge summary, nor did he let Dr. Katz know that the records were available for review. At no time prior to or during trial did either of the attorneys or either of the expert witnesses review any portion of the defendant's extensive medical records other than the discharge summary.

The presentation of evidence at trial commenced on September 23, 1994, and the prosecution rested its case on September 26. The next day, September 27, Dr. Katz came to the court house to testify for the defense. Approximately thirty to forty minutes prior to taking the stand, Dr. Katz was in the men's room with defense counsel. While in the men's room together, defense counsel handed Dr. Katz a copy of the Baystate Medical Center discharge summary from the defendant's 1985 hospitalization. This was the first time Dr. Katz had seen any portion of any medical record pertaining to the defendant's 1985 accident. At that time, Dr. Katz did not review the summary with care but only, in his words, "somewhere between glanced [at] and read it."

On direct examination, Dr. Katz opined that the defendant's mental illness, aggravated by her consumption of alcohol, had rendered her incapable of forming a specific intent to kill and incapable of appreciating the wrongfulness of her conduct. Dr. Katz testified that the defendant's illness caused her to suffer delusions and hallucinations, and he explained the defendant's inability to appreciate the wrongfulness of her conduct with reference to a hypothetical about a person hallucinating that she was under attack.

Dr. Katz testified that the defendant was suffering from "a mixed psychotic disorder," which he described as having both "organic" and psychological features. Dr. Katz explained that by the term "organic," he meant physical brain dysfunction or "dysfunction of the brain tissue itself." He repeatedly emphasized that this "organic" component of the defendant's condition took her beyond what he called "the garden variety psychotic patient," pointing out that "most of the people who suffer from psychosis don't have evidence of significant brain

injury" and that "[m]ost psychiatric patients do not have an organic disability." He explained to the jury that alcohol would "seriously complicate" the condition of the "garden variety psychotic patient," and suggested that the defendant, with her additional "organic" dysfunction, would suffer even more "profound" adverse effects from alcohol consumption. As to the basis of his belief that the defendant's psychosis had "organic" features, Dr. Katz pointed to specific aspects of his examination that suggested the presence of some "organic" problem. As to the source of this "organic" damage to the brain, Dr. Katz pointed to the defendant's long-standing substance abuse, explaining that such abuse can affect brain function over time, and to her history of head injury: "[S]he also was involved in a serious motor vehicle accident, was in a coma for a number of months and has a plate in her head."

On cross-examination, the prosecutor had Dr. Katz confirm that the source of his information about the defendant's alleged coma and the alleged plate in her head was the defendant herself. The prosecutor then confronted Dr. Katz with the Baystate Medical Center discharge summary and asked him to locate therein any reference to a "coma" or "plate." Dr. Katz, who admitted that he had only just been shown the summary shortly prior to taking the stand, acknowledged that the discharge summary contained no such references. The prosecutor then elicited from Dr. Katz that his testimony about the defendant suffering from hallucinations and delusions also came exclusively from the defendant, and he had Dr. Katz confirm that he had believed her report of such hallucinations and delusions. The prosecutor then likened Dr. Katz's belief in the defendant's report of hallucinations and delusions to his belief in her report that she "had a plate in her head" and had been "in a coma for several months."

In rebuttal, the Commonwealth presented testimony from Dr. Kelly to the effect that the defendant did not suffer from any mental disease or defect that prevented her from forming the requisite intent to kill or from appreciating the wrongfulness of her actions. When questioned about what records he had reviewed prior to forming his opinion, Dr. Kelly identified the Baystate Medical Center discharge summary as one of the items he had seen. He explained that he had expressly requested to see those records because he had thought "it was unlikely that she had the injuries she claimed." From his review of the

discharge summary and from his examination of the defendant, Dr. Kelly concluded that there was no evidence of any "organic brain injury." Dr. Kelly opined that the defendant's reported hallucinations differed in both their nature and duration from hallucinations ordinarily suffered by psychotic patients and that, in his view, the defendant's claimed hallucinations were fabricated.

In his closing, defense counsel made no reference to "organic" brain dysfunction, the defendant's 1985 car accident, the defendant's having been in a "coma," or the defendant's having a "plate" in her head. That aspect of Dr. Katz's testimony was never mentioned.

The prosecutor's closing made repeated reference to the defendant's ostensible lies about the extent of her 1985 injuries and about her hallucinations. The discrepancy between her claimed "coma" and "plate" and the absence of such items in the discharge summary became a refrain that ran through much of the closing argument, suggesting that the defendant's claims in this regard were fabricated, along with her claims of hallucinations and delusions, in order to create a defense in her case.[3] The prosecutor pointed out to the jury that it was the Commonwealth's expert, Dr. Kelly, who had accurately assessed the situation: "He didn't buy it. He wanted to see the discharge summary because he didn't think she was telling him the straight story. He didn't believe her, and guess what, Dr.

---

[3]Dr. Katz's belief in the defendant's head injuries and hallucinations was ridiculed as follows:

> "[W]hat does Dr. Katz tell us? You remember that organic problem she had, remember that one. Why this poor woman, the poor dear, months in a coma. My God, she has a plate in her head, tugs at the heart strings. What a terrible thing.

> "Maybe this is something organic. Oh wait, geeze, looking at the discharge summary of that hospital says she wasn't in a coma. She doesn't have a plate in her head.

> ". . . .

> "Doctors come in and, 'Yeah, she's in a coma, plate in my head.' I will tell you if it wasn't for Kelly, that little piece of work might have worked. You might be sitting here saying, 'Oh, that poor woman was in a coma. There must be something organic.' "

Kelly was right."[4] The prosecutor's closing argument ended with the following:

> "Boy is she slick, she is slick. She suckered Jose Correa and she drove this knife into his heart. She suckered Doctor Katz, had him talking about comas and plates. Don't let her sucker you on the evidence. Convict her of murder in the first degree."

After deliberating for one hour, the jury found the defendant guilty of murder in the first degree.

The defendant's motion for new trial asserted, inter alia, that the complete medical records of the defendant's 1985 hospitalization corroborated the defendant's claim that she had been in a "coma" and that, while not supporting the specific claim about a "metal plate" in her head, the records confirmed that she had had extensive and repeated surgeries involving her scalp, face, and ears. Represented by new counsel, she claimed that trial counsel's failure to provide Dr. Katz with the medical records (including the failure to provide Dr. Katz with even the discharge summary until a matter of minutes before he testified) constituted ineffective assistance of counsel.

At the evidentiary hearing on the motion for a new trial, Dr. Katz identified multiple references in the 1985 medical records that confirmed, in his opinion, that the defendant had indeed been comatose and unconscious for a period of weeks and that her injuries had included what he characterized as severe head trauma resulting in brain injury.[5] Among other items, Dr. Katz pointed to a CT scan showing diffuse brain swelling, which was "a very serious finding indicative of a severe brain trauma." The swelling had compressed the ventricular system, which (according to Dr. Katz) signified a severe degree of such swelling. There were episodes of spasmodic twitching and references to

---

[4]The same point was repeated later on during the prosecutor's closing: "[Dr. Kelly] was right. The thing we were able to find out about, ladies and gentlemen, the one thing that is one hundred percent, she is not in a coma from the accident. She does not have a plate in her head."

[5]He also noted that, from a more careful reading of the discharge summary alone, certain entries in that summary indicated that there must have been a significant period of unconsciousness. This testimony strongly suggests that, had he seen even the discharge summary in time and had an opportunity to review it before testifying at trial, his answers on cross-examination would have been very different.

the defendant's pupils as "sluggish," both of which also suggested brain damage. He also pointed to references concerning the patient's lack of response to painful stimuli, which signified that the patient was in the deepest state of unconsciousness that would normally be referred to as a "coma." The records indicated that her breathing had been suppressed, which "is oftentimes seen in individuals with a coma." He also observed that, at one point, the defendant's coma was so profound that her doctors questioned whether she "may already be [without] brain function," which he interpreted to mean that her doctors were considering whether she was "brain dead." He also noted that the record was replete with information about extensive injuries (including fractures, lacerations and severe burns) to her face, scalp, and ears that required multiple surgical procedures. While none of those procedures actually involved a "plate," the procedures were numerous and extensive such that the patient could mistakenly believe that a "plate" had been inserted.[6] Thus, while the records did not corroborate the defendant's claim that she was in a coma for a matter of "months," they did corroborate that she was comatose and unresponsive for several weeks, that she had suffered brain injury (among a host of other severe injuries), and that she had undergone extensive surgery to her head, ears, and face. Dr. Katz was of the view that the medical records amply supported his assessment that the defendant's mental illness had an "organic" component of physical brain damage.

On January 13, 1999, the motion judge ruled that trial counsel had been ineffective in failing to obtain, review or provide to the defense expert the medical records pertaining to the defendant's 1985 accident.[7]

2. *Ineffective assistance of counsel.* On the Commonwealth's

---

[6]These procedures included removal of her scalp, the amputation of one of her ears, repair of facial fractures, and skin grafting.

[7]The motion judge also ruled that defense counsel's failure to interview the bartender, Susan Brown, constituted ineffective assistance of counsel. Brown had known the defendant for many years and was an eyewitness to the events leading up to the stabbing. At trial, when the prosecutor asked whether the defendant's behavior had changed after her 1985 accident, Brown had responded, "Not really, no." However, at the evidentiary hearing on the motion for new trial, Brown claimed that, after the accident, alcohol consumption made the defendant noticeably more aggressive than she had been prior to the accident. Had Brown been interviewed by defense counsel, she could have given testimony consistent with Dr. Katz's opinion that the 1985 accident had indeed had an adverse impact on the defendant's mental illness. The motion

appeal of the grant of a defendant's motion for a new trial, we consider whether the judge committed a significant error of law or abuse of discretion in allowing the defendant's motion.[8] *Commonwealth* v. *Martin*, 427 Mass. 816, 817-818 & n.2 (1998). To prevail on a claim of ineffective assistance of counsel, the defendant must show, first, that "there has been serious incompetency, inefficiency, or inattention of counsel . . . falling measurably below that which might be expected from an ordinary fallible lawyer" and, second, that counsel's conduct "has likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). See *Commonwealth* v. *Urena*, 417 Mass. 692, 699 (1994) (defendant must show "actual prejudice"); *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977) (to satisfy second prong of ineffective assistance claim, defendant must show that "better work might have accomplished something material for the defense").

Counsel's failure to review or provide to the defense expert medical records regarding a serious automobile accident in which the defendant sustained significant head (and other) injuries fell measurably below that of an ordinary fallible lawyer. Where, as here, a defendant claiming lack of criminal responsibility has a significant medical history that appears to have contributed to the underlying mental disease or defect, competent counsel would certainly investigate the full extent of that contributing medical history. The possibility that a defendant's mental illness could be explained and confirmed by reference to some demonstrable physical illness or injury would be of such obvious value to the defense that one would expect

judge's assessment was that, while Brown's potential testimony might not be enough by itself to have affected the jury's decision on criminal responsibility, the combination of that lay testimony with accurate and complete medical information from the 1985 records could have affected the jury's decision. Because we concur with the motion judge that the failure to obtain, review and provide the defense expert with the defendant's medical records constituted ineffective assistance of counsel, we need not address separately the extent to which the failure to interview Brown bolsters the defendant's claim of ineffective assistance of counsel.

[8]Where the defendant's motion for a new trial was allowed and the matter is before us on the Commonwealth's appeal, we do not apply the substantial likelihood of a miscarriage of justice standard provided by G. L. c. 278, § 33E. See *Commonwealth* v. *Hill*, 432 Mass. 704, 710 n.14 (2000).

counsel to explore it both promptly and thoroughly.[9] The opportunity to present the jury with a medical explanation for the defendant's mental illness, an explanation that could both corroborate the existence of the mental disease and portray the defendant's mental illness in a sympathetic light, should not have been squandered.

Strategic choices by trial counsel do not amount to ineffective assistance of counsel unless those strategic decisions are "manifestly unreasonable." *Commonwealth* v. *White*, 409 Mass. 266, 274 (1991). In the present case, trial counsel did not testify at the hearing on the motion for a new trial, and he did not articulate any strategic reason for not having reviewed the Baystate Medical Center records. There is no strategic reason for not investigating the defendant's medical history in a case of this nature. Defense counsel can, by way of the client's own release, obtain the records directly from the treatment providers, without even alerting the Commonwealth to the fact that such records exist. Depending on the use ultimately made of the materials in the records, later disclosures may follow, but there is no strategic risk whatsoever in simply obtaining the records for defense counsel and the defense expert's review.

The Commonwealth argues that defense counsel behaved reasonably in accepting his client's version of her prior injuries and that he was not required to verify the defendant's statements about those injuries; therefore, his failure to do so does not amount to ineffective assistance of counsel. Generally, defense counsel are entitled to rely on information provided by their clients without further verification. *Id.* However, any decision by counsel "not to investigate must be directly assessed for reasonableness in all the circumstances." *Strickland* v. *Washington*, 466 U.S. 668, 691 (1984). In this case, the information relayed by the client — the defendant's prior medical condition following a serious accident — is not a subject on which one would expect the patient to have detailed information or a sophisticated understanding. Because of the technical and complex nature of modern medicine, it normally takes expert

---

[9]Not only did counsel fail to pursue this avenue of investigation himself, but he ignored this avenue even on being alerted to the fact that the Commonwealth's expert was looking into the medical records. Competent preparation of one's own expert witness includes, at a minimum, providing the expert with all the available underlying data that are being reviewed by the opposing expert.

assistance to understand and to appreciate the significance of the entries contained in medical records. One does not view the patient's own recollection as a reliable source of information for such details as laboratory test results, diagnostic radiology reports, and the like.

The unreliability of this particular defendant on such difficult subjects was made even more evident by the simple fact that she was unconscious at the time that this critical part of her medical history was unfolding. Where the whole purpose behind this aspect of defense counsel's investigation is to determine precisely how much brain damage was suffered in the wake of the 1985 accident, it is unreasonable to consider the unconscious and thereafter brain-damaged patient as a reliable source of information as to the exact nature and severity of her injuries and medical treatments. Moreover, from his own evaluation, Dr. Katz determined and reported back to counsel that the defendant was a "poor historian." Having been alerted by the expert that the defendant was not a reliable source of information (even as to aspects of her background that one would expect her to retain), it was particularly unreasonable of counsel to ignore readily available medical records that could provide an accurate medical history.[10]

With regard to the impact that the medical records could have had at the defendant's trial, we agree with the motion judge that proper review of the medical records in advance of trial could have had a significant impact on the jury's assessment of the evidence. Dr. Katz's opinion repeatedly referenced the "organic" component of defendant's mental illness, including the observation that the adverse effects of alcohol consumption would be worse in a patient whose psychotic disorder included physical damage to the brain tissue itself. It was this "organic" component to the defendant's disorder that, in Dr. Katz's words, distinguished her from the "garden variety" psychotic patient. From a technical, medical perspective, the evidence that the defendant had previously suffered significant brain injury in her

---

[10]At the evidentiary hearing on the motion for a new trial, Dr. Katz testified that he had expressly requested counsel to obtain the records from the defendant's 1985 hospitalization. The motion judge's decision does not contain any finding with respect to whether such a request was made by the expert. If, as Dr. Katz claimed, defense counsel ignored his own expert's request for this information, the failure to obtain the records would be even more unreasonable.

1985 accident was important to Dr. Katz's opinion and thus to the viability of the lack of criminal responsibility defense.

Beyond the purely medical aspects of the case, the purported discrepancy between the defendant's medical records and her account of her "coma" and "metal plate" took on an even larger strategic importance at trial. By treating this discrepancy as a self-serving fabrication, the prosecution sought to discredit all of the defendant's accounts of her symptoms, including her accounts of visions, voices, hallucinations, and delusions. The prosecutor was able to point to the Commonwealth's expert as the one who had been properly skeptical of the defendant's claims and to portray Dr. Katz as gullible and unprofessional for having been taken in by the defendant's scheme.[11] As illustrated by the repeated references in the prosecutor's closing argument, the Commonwealth thought that the absence of any record to substantiate the defendant's claimed "coma" or "plate" was one of the most persuasive pieces of evidence in the case.[12] Where, as here, the very matter as to which defense counsel has been ineffective becomes one of the linchpins of the prosecutor's closing, the defendant has met her burden of showing prejudice. The motion judge correctly decided that "the jury may have ruled differently" if the medical evidence of the defendant's brain damage had been properly investigated, reviewed with the defense expert, and presented at trial.

The motion judge's order granting the defendant a new trial is affirmed and the matter is remanded to the Superior Court.

*So ordered.*

[11]There is no claim that the prosecutor, working from the discharge summary alone and relying on Dr. Kelly's interpretation of that discharge summary, acted in bad faith in making these arguments.

[12]The Commonwealth argues that there was also persuasive evidence of premeditation and consciousness of guilt such that the medical evidence would not have affected the jury's assessment of criminal responsibility. The argument does not change the fact that, as tried, the Commonwealth asked the jury to interpret the absence of such medical evidence as conclusive proof that the defendant's claimed mental disease was a complete fabrication and that her expert, who had blindly accepted those false claims as truthful, was not to be credited. The burden was on the Commonwealth to prove criminal responsibility beyond a reasonable doubt. *Commonwealth* v. *Keita*, 429 Mass. 843, 849-854 (1999). Defense counsel's failures gave the prosecution a means, that it would not otherwise have had, by which to satisfy its burden of proof, and the Commonwealth took full advantage of those means. Effective counsel would not have given the Commonwealth such an undeserved advantage.