## Commonwealth vs. Kareed Baker.

Suffolk. September 8, 2003. - December 11, 2003.

Present: Marshall, C.J., Greaney, Ireland, Spina, & Cowin, JJ.

*Practice, Criminal,* New trial, Assistance of counsel, Argument by prosecutor, Conduct of prosecutor, Instructions to jury, Sequestration of witnesses, Capital case. *Constitutional Law,* Assistance of counsel. *Evidence,* Expert opinion, Prior misconduct, Relevancy and materiality, Identity.

Prosecutorial misconduct required the allowance of a defendant's motion for a new trial of an indictment for murder in the first degree, where the prosecutor, by disavowing before trial a particular theory of the case later relied upon, led the trial judge to believe that an expert witness for the defense was not needed, thereby precipitating the judge's rescission of the order for funds that would have enabled the indigent defendant to attempt to counteract the Commonwealth's theory of the case. [526-527]

At a murder trial, the defendant's counsel rendered ineffective assistance in his failure to investigate whether the findings and conclusions of the Commonwealth's experts regarding a hair introduced in evidence were accurate, whether other available tests might have excluded the victim as the source of the hair, and what risks those tests entailed. [527-529]

At the trial of an indictment for murder in the first degree of an infant, where the Commonwealth alleged that the defendant had smashed the infant's head against a wall, a Superior Court judge erred in admitting in evidence prejudicial testimony concerning prior bad acts of the defendant, the victim's father, in purportedly intending to engage in a drug transaction the day prior to the victim's death, and in having punched or thrown things against walls in the past; further, the judge exceeded the limits of discretion by admitting in evidence medical expert testimony that the victim had been injured on at least three occasions prior to his death, where the evidence lacked the requisite nexus to any conduct of the defendant. [529-533]

Indictment found and returned in the Superior Court Department on October 2, 1996.

The case was tried before *Thomas E. Connolly,* J., and a motion for a new trial, filed on March 13, 1998, was heard by him.

*Philip G. Cormier (Andrew Good* with him) for the defendant.

*Brian J.S. Cullen,* Assistant District Attorney *(Joshua Wall,* Assistant District Attorney, with him) for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant of murder in the first degree on the basis of extreme atrocity or cruelty. The victim was the defendant's seven month old son. Represented by new counsel, the defendant appeals from the judgment of conviction and the denial of his motion for a new trial, arguing that a combination of prosecutorial misconduct, constitutionally ineffective representation by his trial counsel, and errors by the judge require a new trial. We agree. Accordingly, we reverse and order that the case stand for retrial.

1. (a) We first summarize the evidence at trial and the respective theories of the prosecution and the defense (leaving for later in this opinion the specific matters that persuade us a new trial is required).

At trial, there was no dispute that the victim, Dymitris Baker, died of multiple skull fractures and swelling of the brain, consistent with his head being hit with a hard, blunt object or having been slammed against a hard, blunt surface. The Commonwealth presented evidence that the defendant first met Naomi Poe in August of 1994, when Poe was fourteen years old and the defendant twenty-three years old. Six months later, Poe moved in with the defendant, and, in February, 1996, she gave birth to their son, Dymitris. After Dymitris was born, Poe resided at St. Mary's Women and Infants Center, where she participated in parenting classes. In July of 1996, Poe moved out of the center with the child and returned to live with the defendant at his apartment in Chelsea.

On September 10, 1996, Poe and the defendant left Dymitris in the care of Poe's grandmother, who lived in the Dorchester section of Boston. Poe and the defendant drove to New York City to purchase approximately $800 worth of cocaine and, returning to Boston about 1 A.M. on September 11, picked up Dymitris in Dorchester and brought him back to their apartment. The child laughed and smiled during the ride back to their apartment. He could focus his eyes, turn his head, had no marks or bruises on his body, and did not appear to be in any pain.

On September 11, although Dymitris was unusually sleepy and had a slight cold, he stood up with Poe's assistance, smiled, and crawled around the apartment between naps. Poe argued

with the defendant about a woman he knew. Later that evening, the defendant left the apartment to bring back some food from a Kentucky Fried Chicken restaurant. At midnight, Poe drove to Dorchester in order to deliver drugs to her brother there. Poe testified that, when she left, she thought that Dymitris was sleeping in his crib. The defendant was awake and speaking on the telephone.[1]

At 12:19 A.M. (it was now September 12), the defendant dialed 911 and hung up the telephone without speaking. He immediately redialed and stated to a 911 dispatcher that "[his] baby stopped breathing." The defendant told the dispatcher that the child had been in the crib and moving prior to the call. After administering CPR at the dispatcher's direction, the defendant reported hearing Dymitris "gasp." A paramedic, who arrived at the defendant's apartment minutes later, testified that Dymitris had a strong pulse but that his breathing most likely had stopped within ten minutes of the paramedic's arrival. Dymitris was transported to a hospital and placed on a respirator. Tests conducted later that day revealed no brain activity, and Dymitris was pronounced dead at 7:03 P.M. After a hearing before a judge in the Juvenile Court, Dymitris was removed from the respirator.

At trial, several medical experts who testified for the Commonwealth could not pinpoint the exact time Dymitris's injuries were inflicted. The witnesses consistently testified, however, that the child would have become comatose immediately on sustaining the injuries.

The Commonwealth's primary theory of the case was that the defendant, left alone at home with his son, violently and repeatedly smashed his head against the wall or walls of the apartment, thereby crushing his skull. In support of this theory, the Commonwealth presented evidence that the defendant had a history of striking, or throwing objects against, walls when he became angry. The Commonwealth presented evidence that the defendant was responsible for the presence of three indentations

---

[1]Poe testified that, when she returned to the apartment at 1:19 A.M. on September 12, 1996, it was empty, and a recorded message from the defendant on their telephone answering machine informed her that Dymitris had been taken to a hospital.

in the wallboard of his apartment: one in Dymitris's bedroom (made in the winter of 1995-1996, when the defendant punched the wall while exercising wearing boxing gloves); a second in the hallway (made in February of 1996, when the defendant punched the wall with his bare fist in anger over a dispute with Poe about another woman); and a third in the living room (made in the spring or summer of 1996, when the defendant threw a bottle at the wall).[2] Testimony of a State trooper who searched the apartment established the presence of a substance resembling fresh plaster on the floor beneath the indentation in the hallway wall, plaster which, Poe testified, had not been there when she left the apartment just before midnight on September 11. Poe also testified that the indentation in the hallway wall appeared to be larger than it had been after the defendant had punched it in February. A microscopic slide containing a single hair, one fifth of an inch in length, found imbedded in the plaster in the indentation, was introduced in evidence, and a forensic chemist from the State police crime laboratory who had examined the hair testified that it was a human hair. The prosecutor argued to the jury that this hair came from the head of Dymitris.

Another expert for the Commonwealth, Dr. Ann Marie Mires, a forensic anthropologist and the director of the human identification unit at the medical examiner's office, compared the size of a plaster replica of Dymitris's skull with the indentations in the wallboard from the living room and hallway. Dr. Mires opined that the size and shape of the indentations were consistent with the dimensions of Dymitris's head. Dr. Mires illustrated to the jury, using a doll as a model,[3] that the indentations in the wallboard were consistent with having been "impacted" by the left side of Dymitris's head.

---

[2]Poe also testified that, in the summer of 1996, the defendant had thrown a plate against a wall over a dispute with an insurance company.

[3]The use of models, such as the doll, generally lies in the sound discretion of the judge. Here, however, the doll that was used in the examination of the expert was, by all accounts, of dimensions much smaller than those of Dymitris and, thus, had the potential to mislead the jury. The defendant's trial lawyer, therefore, was on firm ground when he objected to the use of the doll because its dimensions did not approximate those of Dymitris, thus giving the jury an inaccurate impression. The questionable use of the doll by the prosecutor serves to fortify our conclusion that the trial was unfair. At retrial, the

The Commonwealth's medical experts testified that Dymitris had suffered bone fractures on at least three separate occasions prior to September 12. The Commonwealth argued to the jury that these injuries revealed a pattern of child abuse and, further, that it was the defendant who had inflicted the abuse on his son in the months leading up to the child's death.

The defendant's defense at trial was that someone else (most likely, Poe herself) was responsible for Dymitris's fatal injuries. The defendant's trial counsel presented evidence that the defendant was a loving father, who had recently begun attending classes at a local community college in order to become a surgical technician. According to Poe herself, the defendant was supportive, helped care for Dymitris, providing clothing, toys, and furniture, and encouraged Poe to return to school. The defendant's trial counsel argued to the jury that, although the defendant previously had struck, or flung objects at, the walls of his apartment, there was no evidence that he had ever struck his son, Poe, or anyone else for that matter, in anger. During his cross-examination of Poe, the defendant's trial counsel established that Poe had been alone in the apartment with Dymitris at approximately 11 P.M. for "[a]bout ten minutes," while the defendant went to a Kentucky Fried Chicken restaurant. The defendant's trial counsel also elicited evidence that Poe, who had been in the custody of the Department of Social Services (DSS) since eleven years of age, repeatedly had run away from her DSS placements. Poe had left St. Mary's Women and Infants Center four times since Dymitris's birth, taking the child with her each time. The defendant's trial counsel presented evidence that, at the time of Dymitris's death, Poe's intent was to leave the defendant and to support herself and Dymitris by selling drugs. Of Dymitris's two parents, the defendant's trial counsel argued to the jury, it was Poe who continually had put the child at risk. The defendant did not testify.

The judge instructed the jury on murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty and on murder in the second degree. He refused the request of the defendant's trial counsel to instruct on involuntary

judge may exercise discretion, but, if a doll is used as a model, the doll should be one of the same approximate dimensions as Dymitris.

manslaughter. As has been stated, the jury based the defendant's conviction of murder in the first degree on the theory of extreme atrocity or cruelty.

(b) We now summarize the evidence contained in affidavits and reports submitted in support of the defendant's motion for a new trial, the arguments presented to the judge (who also presided at the trial) and the judge's rulings on the motion. The motion was supported by reports of two experts retained post-trial by the defendant's appellate counsel: Dr. Peter R. DeForest, a forensic crime scene reconstructionist, and Dr. Terry Melton, a DNA specialist. Dr. DeForest had examined the impressions of the indentations in the walls of the living room and hallway and the plaster skull replica of Dymitris's head used by the Commonwealth at trial and concluded that, contrary to the testimony of Dr. Mires, there was nothing to suggest that either wall had been "impacted" by Dymitris's head. In addition, after examining the single hair found in the wall under a microscope, Dr. DeForest had determined that "it was more likely that the hair was a limb hair from the defendant than a head hair from [Dymitris]." Dr. Melton had conducted mitochondrial DNA testing on the hair and had determined conclusively that the hair, in fact, did not belong to Dymitris at all.

The motion for a new trial was supported as well by an affidavit of the defendant's trial counsel, attesting to the following chain of events. Prior to trial, the defendant's trial counsel had sought, and received, funds for the purpose of retaining a mechanical engineer to conduct an independent examination of the wall and assess the validity of the Commonwealth's anticipated theory of the wall as the murder weapon. The order for those funds, however, was rescinded by a judge (not the trial judge), over objection, during a hearing on the defendant's motion to continue the case to allow his experts sufficient time to make their findings and conclusions. The judge's rescission order came after the prosecutor stated to the judge that the Commonwealth had "no intention of specifying that the baby's head was smashed against a wall." The prosecutor made this assertion, without any prompting, in response to the judge's question (directed at the defendant's trial counsel) whether a

mechanical engineer was indeed necessary. The prosecutor also informed the judge that "[w]e are not retaining mechanical experts in this area," and "[w]e are not alleging that the wall is the murder weapon in this case. There are all sorts of holes in the apartment. One of them could or could not be consistent with the shape of the baby's head. But that's not the key to this case by any means."

As a result of the rescission of the order for funds, the defendant's trial counsel proceeded to trial without the assistance of any expert. He stated in his affidavit that he was "surprise[d]" at trial when the Commonwealth presented evidence and argument with respect to the wall. The defendant's appellate counsel maintains that both the prosecutor's misconduct and the failure of the defendant's trial counsel to appeal from the judge's revocation of funds or to renew his motion for funds to conduct an independent examination of the hair or the wallboard, deprived the defendant of a substantial ground of defense to the Commonwealth's primary theory of the case and contributed to a trial that was fundamentally unfair.

In his findings and order denying the defendant's motion for a new trial, the judge expressly rejected that portion of the defendant's trial counsel's affidavit in which he claimed surprise. The judge determined that the defendant's representation was not in any way ineffective or incompetent and characterized the defendant's trial counsel's performance as "effective as it could be."[4]

2. We now turn to the merits. The defendant's arguments that a new trial is required are to be analyzed under G. L. c. 278, § 33E, pursuant to the standard stated in *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). Thus, "we shall consider whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." *Id.* In this case, conduct by the defendant's trial counsel, the prosecutor, and the judge each contributed to a verdict that cannot be said to be fair.

---

[4]The defendant also raised other claims of error that were not addressed in the judge's written findings of fact and order denying the motion for a new trial. All of the errors discussed in this opinion were raised initially in the defendant's motion for a new trial.

(a) The Commonwealth's theory at trial was that the defendant fatally injured Dymitris by smashing his head into the wall (or walls) of the apartment. There is no question that the defendant, who was indigent, was entitled to funds in order to gather and present evidence in defense of this charge. See *Commonwealth* v. *Lockley*, 381 Mass. 156, 160-161 (1980); *Commonwealth* v. *Possehl*, 355 Mass. 575, 576-577 (1969). The rescission of the order for funds left him with no expert or evidence to counteract the Commonwealth's theory of the case. The jury, in effect, was presented with the unrebutted testimony of Dr. Mires, who testified under the aegis of the State medical examiner's office, and who was presented to the jury as highly knowledgeable on the subject on which she testified. Had the defense been able to present Dr. DeForest's findings and conclusions to the jury, substantial doubt could have been cast on the testimony of Dr. Mires that the indentations in the wallboard could have been made by Dymitris's head. At a minimum, the assistance of an expert such as Dr. DeForest would have allowed the defense to expose the jury to weaknesses in Dr. Mires's opinions.[5]

Regardless of her intention, the prosecutor should not have led the judge to believe that the expert was not needed.[6] See *Commonwealth* v. *Dotson*, 402 Mass. 185, 187 (1988). "[A] judge is quite capable of evaluating the various factors involved in awarding funds for expert witnesses without the Commonwealth's adoption of an adversary stance," *id.*, especially one, as here, that, disingenuously or not, misrepresented the Commonwealth's position. The prosecutor also had a continuing obligation of candor to the court and to the defendant. See *Matter of Neitlich*, 413 Mass. 416, 423 (1992). It must have

[5]For example, there was no evidence that Dr. Mires considered, or even recognized, that a supporting stud behind the indentation in the wallboard in the hallway would, according to Dr. DeForest's report, have markedly influenced the shape of any impact at that location.

[6]The Commonwealth submitted an affidavit in opposition to the defendant's motion for a new trial, in which the prosecutor explained the background and context of her statement to the judge. In her affidavit, the prosecutor stated that she had not intended to interfere with the defendant's right to funds for an expert and that, on several occasions, she had informed the defendant's trial counsel that she intended to call Dr. Mires to testify to her examination of the wallboard damage.

been obvious to her that her disavowal of an intention to focus on the apartment walls as the murder weapon had gained the Commonwealth a strategic advantage over the defendant. In the circumstances of this case, the prosecutor was under a duty promptly to notify the judge and the defendant's trial counsel of any change in position. She cannot have been unaware that her failure to do so would severely prejudice the defendant.

Even though the unfavorable situation was not of the defendant's trial counsel's own making, it was incumbent on him to take steps to ensure his client's constitutional right to prepare a defense. The record is ambiguous as to when he became aware that the walls as murder weapon would be the Commonwealth's principal (essentially, its only) theory and that the Commonwealth would rely heavily on the testimony of Dr. Mires.[7] At that time, however, he should have requested a continuance in order to seek funds (again) for an expert's thorough evaluation of the wallboard evidence. We conclude that conduct on the part of the prosecutor, compounded by the failure of the defendant's trial counsel to take steps to correct the situation, deprived the defendant of a substantial ground of defense. The core assertion of the Commonwealth's case became the exact theory (and evidence) that the prosecutor had expressly disavowed pretrial. On this basis alone, the defendant is entitled to a new trial.

(b) The above matter was not the only prejudicial occurrence at the trial. To make its theory of the case even more vivid, the Commonwealth introduced the single hair found in the indentation in the hallway wall. Although the jury knew, from the

[7]The trial transcript indicates that the defendant's trial counsel knew at the outset of trial that the Commonwealth intended to present some evidence concerning the wall and to argue to the jury that one of the possible ways the defendant could have killed Dymitris was by swinging his head into the wall.

The defendant's trial counsel stated in his affidavit that "[a]t trial, directly contrary to the representations it had made . . . the Commonwealth, to my surprise, reversed its position and indicated that it was going to present evidence that the wall was the weapon . . . . While I was aware that Dr. Mires might be called by the Commonwealth as a witness at trial, I had expected her testimony to be consistent with the assertions made by the Commonwealth [to the judge at the continuance hearing]. Instead, to my surprise, Dr. Mires testified that the indentations in the plasterboard were consistent with having been impacted by the left side of the child's skull, ear and neck."

defendant's trial counsel's vigorous questioning of the Commonwealth's forensic chemist, that the hair had not been determined to be from Dymitris's head,[8] the prosecutor strongly suggested otherwise in her closing comments to the jury. The fundamental importance of the hair to the Commonwealth's theory of the case is demonstrated by the following portion of the prosecutor's comments:

> "Ladies and gentlemen, this wall has the defendant's signature all over it. There is the first punch in the middle and there's the overlaying impression that Doctor Mires spoke of, the overlaying indentation consistent with the size, the shape, the dimensions of Baby Dymitris's head, this wall that held the tiny hair, the human hair that was imbedded in the plaster, this wall that right underneath there was fresh plaster in the carpet."

The single hair was the only physical evidence used by the Commonwealth to link Dymitris to the indentations in the wallboard.[9] The reports and affidavit submitted in support of the defendant's motion for a new trial indicate that, had the defendant's trial counsel retained an expert to examine the hair: (1) a microscopic examination of the hair (which would not have consumed the hair) would have revealed that its likely source was not a human head at all, but a human limb; and (2) mitochondrial DNA analysis (which was available in 1997 at the time of trial) would have determined that the hair had not belonged to Dymitris.

Based on the test results, the judge assumed that, had a DNA test been conducted prior to trial, the testing would have consumed the entire hair and that the results most likely were required to be shared with the Commonwealth. The judge reasoned, therefore, that the "the defendant would have everything to lose and little, if anything, to gain" by testing the hair. The judge concluded, in so many words, that the lack of investigation of the hair was a reasonable tactical decision on

---

[8]The chemist agreed that the hair "was not suitable for any significant comparative purposes" and opined that the hair was "too limited for the type of DNA testing which is useful for hairs."

[9]No traces of blood or tissue had been found in the apartment.

the part of the defendant's trial counsel. This conclusion is untenable.

The defendant's trial counsel was under a duty imposed by both State, see *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974), and Federal, see *Strickland* v. *Washington*, 466 U.S. 668, 690 (1984), constitutional law to conduct an independent investigation of the facts, including an investigation of the forensic, medical, or scientific evidence on which the Commonwealth intended to rely to prove the defendant's guilt. See *Commonwealth* v. *Alvarez*, 433 Mass. 93, 103-104 (2000); *Commonwealth* v. *Farley*, 432 Mass. 153, 156-157 (2000); *Commonwealth* v. *Roberio*, 428 Mass. 278, 281 (1998), *S.C.*, *ante* 245 (2003); *Commonwealth* v. *Haggerty*, 400 Mass. 437, 441-442 (1987). The source of the hair was directly relevant to whether Dymitris's head had struck the wall. Yet, the defendant's trial counsel made no attempt to determine whether the findings and conclusions of the Commonwealth's experts were accurate, whether other available tests might have excluded the child as the source of the hair, or what risks those tests entailed. Until he commenced such an investigation, he simply had no way of making a reasonable tactical judgment. See *Strickland* v. *Washington*, *supra* at 690-691 ("strategic choices made after less than complete investigation are reasonable [only] to the extent that reasonable professional judgments support the limitations on investigation"). We conclude that the defendant's trial counsel's failure to pursue this avenue of investigation was ineffective. See *Commonwealth* v. *Laurore*, 437 Mass. 65, 72-73 (2002).[10]

(c) The trial was also replete with evidentiary errors. On three separate occasions, the Commonwealth was permitted to introduce, over proper objection, evidence of the defendant's prior bad acts. "It is a fundamental rule that the prosecution may not introduce evidence that a defendant previously has misbehaved, indictably or not, for the purpose of showing his bad character or propensity to commit the crime charged." *Commonwealth* v. *Trapp*, 396 Mass. 202, 206 (1985), *S.C.*, 423

---

[10]We reject the Commonwealth's argument that our standard for evaluating ineffective counsel claims under G. L. c. 278, § 33E, is not justified on statutory or constitutional grounds.

Mass. 356, cert. denied, 519 U.S. 1045 (1996). Such evidence may be admissible for other relevant purposes, such as to prove a "common scheme, pattern of operation, absence of accident or mistake, identity, intent, or motive," *Commonwealth* v. *Triplett*, 398 Mass. 561, 563 (1986), quoting *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986), but these exceptions "are not without limitation." *Commonwealth* v. *Trapp, supra.* The inherent danger in improperly admitting evidence of a defendant's prior bad acts is that it "diverts the attention of the jury from the [crime] immediately before it; and, by showing the defendant to have been a knave on other occasions, creates a prejudice which may cause injustice to be done him." *Commonwealth* v. *Jackson*, 132 Mass. 16, 20-21 (1882). Such was the case here.

(i) The judge allowed the Commonwealth to elicit testimony that, on September 10, the defendant and Poe traveled to New York to purchase a substantial amount of cocaine in order to demonstrate what transpired in the twenty-four hour period before Dymitris's death. This was error. The fact that the defendant and Poe had traveled to New York that day may have been relevant to show that the child was with someone other than the defendant and Poe within twenty-four hours of his injury. That the purpose of their trip was to engage in a drug transaction had no relevance to the charge for which the defendant was on trial and could only have served to prejudice the jury against him by portraying him as a criminal.

(ii) Poe testified to five prior occasions when she had observed the defendant become angry and punch, or throw objects at, walls. The Commonwealth argues that the evidence was admissible to show the defendant's identity as the culprit. We disagree.[11] To use prior bad acts to prove identity, "the Commonwealth must show that 'the prior events and the circumstances of the crime charged have such similarities as to be meaningfully distinctive. . . . There must be a uniqueness

---

[11]We also do not agree with the Commonwealth's suggestion that the evidence was admissible to demonstrate that the defendant had not struck Dymitris against the wall by accident. The defendant steadfastly denied that he had done anything to cause his son's death and did not claim mistake or accident.

of technique, a distinctiveness, or a particularly distinguishing pattern of conduct common to the current and former incidents to warrant the admission of evidence of prior bad acts as tending to prove that the defendant was the person who committed the crime charged.' " *Commonwealth* v. *Jackson,* 417 Mass. 830, 836 (1994), quoting *Commonwealth* v. *Brusgulis,* 406 Mass. 501, 505-506 (1990). The similarities between past incidents and the charged offense must be strikingly close, almost like a signature. See *id.* at 840-841.

Here, the past instances where the defendant had punched, or thrown things against, walls did not involve occasions where the defendant had knocked his son (or anyone) against a wall. On the contrary, Poe testified that the defendant had never struck anyone in anger. Without a distinctive resemblance to the crime charged, the logical connection between the evidence of prior acts and the legitimate issue at trial, whether the defendant had killed his son, is too weak to warrant its admission. The evidence was not admissible to demonstrate the defendant's bad character or his propensity to throw his son against a wall. See *Commonwealth* v. *Triplett, supra* at 562-564.

The error was compounded when the judge incorrectly instructed the jury that the evidence was introduced "to prove the inclination to commit the acts as charged in the indictment and also to the existence of some passion or emotion at the time at issue." Although the judge twice attempted to correct the instruction by telling the jury that "the evidence of any prior conduct is being offered for the limited purpose to show the defendant's intent, state of mind, modus operandi and pattern or course of conduct, and is being admitted for that purpose only, and only for that purpose," he never explicitly instructed the jury that they could not consider the prior incidents as evidence that the defendant was inclined to commit the offense charged. The instructions, thus, were inadequate, and the problem was seriously exacerbated by the prosecutor's misuse of the evidence as noted below.[12]

(iii) The Commonwealth introduced medical expert testimony that Dymitris had suffered fractures of the tibia and femur,

---

[12]The following portion of the prosecutor's closing argument to the jury was a classic example of a forbidden propensity argument:

indicating that the child had been injured on at least three occasions prior to his death. One physician testified that, in his opinion, the injuries were the result of child abuse.[13] There was no evidence (either direct or circumstantial) that the defendant had inflicted these specific injuries or, indeed, had ever injured the child. There was some probative value to this testimony, because the prior injuries tended to show that "someone in a custodial relation to [Dymitris] bore him ill will," *Commonwealth* v. *Labbe*, 6 Mass. App. Ct. 73, 76 (1978), and cases cited, and, therefore, that the fatal injury was not accidental. Such evidence is frequently admitted on that basis. However, there was no defense, or statement by the defendant contending, that the fatal injury to Dymitris was the result of accident. In

---

"It didn't take much to set [the defendant] off into a rage, a dispute with an insurance company, an argument about a woman. And you all heard and you all saw what he would do. Strike the wall. With his hand or an object, he would strike the wall.

"The first time, it was on Crawford Street. He had a problem performing and so he took his fist and rammed it through a wall. The second time, they were over on Lafayette. He was exercising. He was playing around in his baby's room where he worked out, where he kept his weights. Boxing with a glove on, he took his hand and he rammed it into the wall, causing a large dent. And then there was the time by the intercom, the first time by the intercom. After a fight with [Poe] about another woman, this defendant took his fist and put it through the wall, leaving a fist-size hole.

"And then he moved into objects. There was the bottle that he threw with so much force that it left a deep impression outlining the bottle. And then he picked up a plate and he flung it so hard into the wall that the wall cracked and the plate shattered. And, ladies and gentlemen, there was the time that he did not pick up the bottle or the plate because, instead, he used him. He used his son, seven months old, less than two and a half feet tall, weighing just over sixteen pounds. This man picked up his son and rammed him into the wall. And just like the plate, Baby Dymitris broke. His little skull shattered like an eggshell."

These comments, while drawing no objection from the defendant's trial counsel, reasoned, in essence, that the defendant should be found guilty because he was someone who would have slammed his son's head into the wall in a fit of rage, and, without doubt, could have contributed to the verdict.

[13]The judge gave no limiting instructions as to the permitted use of this evidence, and none was requested by the defendant's trial counsel.

these circumstances, it cannot be said with assurance that the probative value of the testimony outweighed its certain prejudicial impact on the jury. This is not a case where other evidence, albeit circumstantial, links the defendant to the child's prior injuries or at least tends to indicate the presence of his hostile feelings toward the child. See, e.g., *Commonwealth* v. *Collins*, 26 Mass. App. Ct. 1021, 1022 (1989); *Commonwealth* v. *Labbe, supra.* The prior injuries could have been inflicted by Poe or anyone else regularly entrusted with Dymitris's care. The judge exceeded the limits of discretion by admitting the evidence of the prior injuries, which lacked the requisite nexus to any conduct of the defendant. Further, the prosecutor's closing argument that the defendant had physically abused Dymitris in the months leading up to his death, which was unsupported by any evidence and clearly inflammatory, compounded the unfair prejudice.[14] The evidence compelled the defendant, essentially, to defend against the uncharged offense of child abuse.[15]

(d) Our examination of the record pursuant to G. L. c. 278, § 33E, reveals numerous other trial errors not argued on appeal which, considered together, may have assisted in compromising the jury's verdict. These errors need not be specified in view of our conclusion that a new trial is required on the grounds

---

[14]The prosecutor stated:

> "Baby Dymitris was a victim of child abuse in his own home where he should have been safe and secure at the hands of the man who should have been there to protect him. . . . It was a little secret . . . between a father and his son. . . . But, ladies and gentlemen, now we all know. The evidence is clear. The terrible secret is out. Baby Dymitris spent the months of his short life being battered, being abused. Three separate fractures, three healing fractures, all at different stages, all inflicted at different times. His wrist, his ankle, his thigh, all inflicted before September 12th, 1996, because, on the months leading up to September 12th, 1996, this man didn't kill his baby, not yet. It wasn't until September 12th, 1996, . . . that's when he did it. That's when he picked up the baby and smashed his head against a wall not once, not twice, but three times."

[15]The Commonwealth does not address this argument in its brief or dispute that there was no evidence that the defendant was responsible for Dymitris's old injuries.

discussed.[16] We are confident that they are not likely to be repeated.

None of the arguments made by the Commonwealth persuades us that the serious problems discussed above should be rejected and the verdict saved. Although the evidence was overwhelming that Dymitris died of blunt trauma to his head, following several crushing blows that would have caused him immediately to lapse into a coma, both Poe and the defendant had been alone with the child in the apartment during the time when the Commonwealth's medical experts opined the injuries could have occurred. The defendant's statements to the 911 dispatcher, that Dymitris "just woke up" and that the child was "gasping" (which, according to the experts, the child could not have done), are not so conclusive of his guilt as to overcome our concerns stemming from the multiple trial errors discussed in this opinion. Those errors allowed the jury to be presented with a misleading picture of the evidence, and they cast "real doubt on the justice of the conviction." *Commonwealth* v. *Grace*, 397 Mass. 303, 305 (1986).

3. We comment on issues likely to arise at retrial, which will require fresh consideration by the trial judge.

(a) If the defendant seeks access to potentially privileged records concerning Poe, the judge should decide the request in accordance with the protocol set forth in *Commonwealth* v. *Bishop*, 416 Mass. 169, 179-180 (1993), and *Commonwealth* v. *Fuller*, 423 Mass. 216, 226 (1996).

(b) Prior to trial, the judge sequestered all prospective witnesses, but allowed Poe and her mother, Reanita Poe, to remain in the court room to observe the entire trial. The judge denied the defendant's motion to exempt his own mother, a prospective defense witness, from the sequestration order. At retrial, any decision relating to the sequestration of witnesses is within the judge's discretion to assure a fair trial. See *Commonwealth* v. *Gogan*, 389 Mass. 255, 261 (1983); *Commonwealth* v. *Therrien*, 359 Mass. 500, 508 (1971).

(c) For reasons stated previously, evidence concerning past

---

[16]As just one example, the prosecutor was permitted to present the testimony of its primary witness, Naomi Poe, through the use of leading questions, in spite of repeated proper objections on the part of the defendant's trial counsel.

instances of the defendant striking walls should not be introduced at retrial to prove identity. If, based on the circumstances of retrial, the Commonwealth wishes to introduce the evidence on a theory not considered in this opinion, the judge will have to make a fresh determination whether the evidence should be admitted. If the evidence is admitted, the jury should be carefully instructed on the limited purposes for which the evidence can be considered and on those purposes for which the evidence cannot be used.

(d) An instruction on reasonable doubt in accordance with *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850), should be given. See *Commonwealth* v. *Watkins*, 433 Mass. 539, 546-547 (2001); *Commonwealth* v. *Therrien*, 371 Mass. 203, 207 (1976), *S.C.*, 428 Mass. 607 (1998).

4. The order denying the defendant's motion for a new trial is vacated. The judgment is reversed, and the verdict of murder in the first degree is set aside. The case is remanded to the Superior Court for a new trial.

*So ordered.*