SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. MICHAEL NOGUERA

 
 Docket:
 SJC-13045
 
 
 Dates:
 April 9, 2025 – September 24, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Wendlandt, Dewar, & Wolohojian, JJ.
 
 
 County:
 Bristol
 

 
 Keywords:
 Homicide. Robbery. Larceny. Firearms. Practice, Criminal, Assistance of counsel, Cross-examination by prosecutor, Argument by prosecutor, Presumptions and burden of proof, Instructions to jury, New trial, Capital case. Constitutional Law, Assistance of counsel. Evidence, Presumptions and burden of proof, Corroborative evidence, Medical record. Mental Health. Mental Impairment. License.
 
 

             Indictments found and returned in the Superior Court Department on December 22, 2016.
            The cases were tried before Gregg J. Pasquale, J., and a motion for a new trial, filed on November 16, 2021, was heard by him.
            James L. Sultan for the defendant.
            Shoshana E. Stern, Assistant District Attorney, for the Commonwealth.
            DEWAR, J.  In 2020, a jury found the defendant guilty of murder in the first degree by deliberate premeditation and extreme atrocity or cruelty for the killing of Daniel Smith and also guilty of armed robbery, larceny of a motor vehicle, and unlawful possession of a firearm.  Before this court are the defendant's consolidated appeals from these convictions and from the denial of his motion for a new trial.
            The defendant makes claims of ineffective assistance of counsel and prosecutorial misconduct.  He claims that his trial counsel failed to conduct a sufficiently thorough investigation into his decades-long history of mental illness, obtaining some but not all of the available records.  He also claims that trial counsel made a manifestly unreasonable strategic decision not to introduce in evidence the records that counsel had obtained, because the records would have corroborated the defendant's testimony at trial.  The defendant further argues that the Commonwealth improperly shifted the burden of proof onto the defendant by highlighting, on cross-examination of the defendant and during closing argument, that the defendant had not introduced documentary evidence to corroborate his testimony regarding his mental health diagnoses and treatment history.  And the defendant claims error from a misstatement of the evidence in the prosecutor's closing argument.
            We conclude that the judge did not abuse his discretion in denying the defendant's motion for a new trial.  The claimed shortcomings in counsel's performance did not create a substantial likelihood of a miscarriage of justice in the circumstances of this case.  We further conclude that the Commonwealth did not engage in improper burden-shifting in its questions on cross-examination of the defendant, and that the defendant was not prejudiced by either of the claimed errors in closing argument.  Following review of the entire record of this case under G. L. c. 278, § 33E, we affirm the defendant's conviction of murder in the first degree and decline his request that we reduce the conviction or order a new trial, and we also affirm his convictions of armed robbery and larceny of a motor vehicle.  As the Commonwealth concedes, the defendant's conviction of possession of a firearm must be vacated for lack of evidence that the defendant lacked a license to carry a firearm, see Commonwealth v. Guardado, 493 Mass. 1, 2-3 (2023), cert. denied, 144 S. Ct. 2683 (2024), and we therefore set aside that verdict without further discussion and remand for further proceedings.
            Background.  1.  Commonwealth's case.  We summarize the facts the jury could have found, reserving certain details for later discussion.
            In 2016, the defendant was living with his girlfriend Veronica Suarez in her house in Florida.  The couple socialized and used drugs with the victim, who had moved to Florida from Massachusetts.  Eventually, the victim moved into Suarez's house, shortly before Suarez sold it to avoid foreclosure.  Following the sale of the house, Suarez, the defendant, and the victim lived at a series of hotels, all sharing one room.
            Suarez deposited $35,000 of the proceeds from selling her house into a joint bank account with the defendant.  Suarez, the defendant, and the victim used the sale proceeds to pay for the hotel stays and purchase drugs.  Eventually, after about three weeks of sharing a hotel room, Suarez demanded that both the victim and the defendant leave the room.
            After leaving with the victim, the defendant withdrew $25,000 of the house proceeds from his joint bank account with Suarez and embarked on a road trip with the victim in the victim's vehicle.  Their intended destination was Massachusetts, where the victim wished to visit his sick father, and where the victim's estranged wife and child still lived.  They took a circuitous route, through Texas, and purchased three firearms along the way.
            By October 26, 2016, the two arrived in Massachusetts.  Shortly after arriving, they were introduced to a drug dealer named Edward Jacobs.  Jacobs began selling cocaine to them and socializing with them daily.  The victim sold Jacobs one of the guns purchased en route, a black nine millimeter handgun.
            Jacobs observed that the defendant and victim had an "odd" relationship.  For example, the victim sometimes would not let the defendant speak and would "shut [the defendant] down when [the defendant] was talking."  And Jacobs observed that the victim "was controlling" the defendant's cell phone use; when the defendant used a cell phone, the victim "would either take [the phone] away or look to see what was being texted."
            The defendant and victim parted company on November 4, 2016, after a rupture between them.  In the days leading to the rupture, money was a source of conflict.  The defendant supplied the victim with money from the house proceeds but suspected the victim of stealing additional funds from him.  As the house proceeds depleted, the men became focused on a $7,000 check that remained.  The victim and defendant fought over who was to receive the check when it was mailed from the defendant's bank; each man wanted the check mailed to his own mother.  At the culmination of this dispute on November 4, the victim locked the defendant out of their hotel room, threw the defendant's belongings into the hallway, checked out of the hotel, and drove away.
            In the days that followed, from November 4 until the afternoon of November 7, 2016, the victim, now separated from the defendant and the house proceeds, had little or no money.  He attempted to withdraw money from the defendant's bank account but was denied access.  He sent numerous unanswered text messages to the defendant, sometimes angrily threatening the defendant and his family, and at other times pleading with the defendant to provide him with food and a warm place to sleep.
            Meanwhile, the defendant, stranded without a vehicle on November 4, was picked up by Jacobs.  Jacobs paid for a hotel room for the defendant, and the two men spent much of the following three days together.
            The defendant told Jacobs that he was angry with the victim for abandoning him and for trying to steal his money.  In Jacobs's words, the defendant was "furious," "kind of snapped," and told Jacobs that he was "going to fucking kill" the victim.  The defendant convinced Jacobs to give him the nine millimeter handgun that Jacobs had bought from the victim.  Jacobs understood that the defendant intended to "get [the victim] alone" in a "secluded" place to kill him.  The defendant thereafter carried the gun while socializing with Jacobs and others.
            On November 6, the defendant and Suarez resumed communicating by cell phone.  The defendant told Suarez that the victim previously had been holding his cell phone and had hid Suarez's messages from him.  The defendant learned that the victim had been communicating with Suarez, which angered the defendant.
            Over the course of November 6 and 7, the defendant and Suarez had cell phone conversations and exchanged numerous text messages evincing the defendant's plan to kill the victim.  The defendant told Suarez that he wanted to "get rid of" the victim because the victim had threatened Suarez.  Their text messages referred to the victim as "the Devil" and a "d[i]sease" who had "destroy[ed]" them.
            The defendant sometimes referred to his plan to kill the victim as "building the house," a coded reference that Suarez eventually came to understand as such.  For example, on the afternoon of November 6, the defendant sent text messages to Suarez stating: 
"Please if you ever loved me say nothing to [no one] about this. . . .  Never forget you gave me the green light.  Maybe it[']s the[] only way you [truly] believe [I] would give my life for you.
"From now on we will not talk about that until [I] tell you [I] finished the house [I] was building."
In the early morning hours of November 7, the defendant lamented to Suarez that all his photographs of his road trip were taken on the victim's cell phone and were therefore in the victim's possession, so that the defendant could not share them with her.  But he reassured her, "No matter[,] I will probably have the phone in next 24 hours so there is hope."  Suarez cautioned that the defendant would need the victim's "pin" code to get into the cell phone, and that, without it, the cell phone would "delete[] itself if you try too many times."  The defendant responded that he already had the code.  Calling the victim "a scammer," the defendant told Suarez "[it] is really hard to do all this and get the house built."  Suarez responded with a text message stating in part, "I know he is," and "Don't worry about anything at all.  The house is enough."  Later in the morning of November 7, the defendant told Suarez in a series of text messages, "The house or [I] will be finished tonigh[t] . . . .  [C]ameras cops [I] don[']t care . . . .  There will be one person wh[o] can't answer you tonight."
            On two or three occasions, Jacobs overheard the defendant speaking with Suarez on his cell phone about killing the victim.  One night, Jacobs overheard the defendant tell Suarez that "[t]his has to be done. . . .  I promise, baby, it's going to get done."  The defendant and Jacobs also discussed the defendant's plan; Jacobs agreed to "be there for" the defendant, who instructed Jacobs to keep his cell phone charged and be ready to pick him up afterward.
            On the evening of November 6, after not answering numerous text messages from the victim, the defendant sent the victim a text message stating that the defendant had received his check, was "going to help" the victim, and would give him $2,000.  The defendant also said that he wanted to return the victim's spare car key.  The victim initially declined to meet but eventually drove to find the defendant.  The defendant sent the victim purported directions to the defendant's location but then failed to answer the victim's cell phone calls when the victim could not find him.  The victim gave up his search in the early hours of November 7.  The defendant sent a text message to the victim that his cell phone battery had died -- but, all the while, the defendant had been exchanging the text messages described above, and many others, with Suarez.
            Later on the morning of November 7, the defendant, while sitting in Jacobs's car, got into a screaming argument with Suarez on the cell phone after Suarez admitted to having a sexual encounter with another man.  The defendant punched the dashboard several times, and, when he would not calm down, Jacobs told the defendant to get out of the car and then drove away.  Jacobs nevertheless sent a text message to the defendant later that morning telling him to "hit me up" when the defendant was "done."
            At around noon the same day, the defendant responded to Jacobs with a series of text messages to confirm the getaway plan.  The messages began:  "Stay availab[l]e [I] got a ride to finish my house . . . .  [I] got so much pain and the h[o]use is [g]etting all of it . . . .  [I] will need a ride when [I] text you real fast somewher[e] around [T]aunt[o]n.  Peace out."  The defendant subsequently added, "[I]f y[o]u really want to save me [I] will need a fast exit" and "don[']t let the phone ring twice."  The defendant further told Jacobs that he was deleting all of Jacobs's text messages and instructed Jacobs "don[']t text me."[1]
            Later that day, the defendant sent a text message to the victim that he was upset because Suarez had cheated on him.  The victim responded with sympathy.  The two arranged to meet, and, as shown in surveillance video recordings, they visited a liquor store and a fast food restaurant before checking into a hotel together.
            On November 8, the defendant borrowed a cell phone to call Suarez and tell her that he was leaving the hotel with the victim.  After that call, Suarez sent Jacobs a text message saying that the defendant did not have access to his own cell phone but was "still with the devil," was "still looking for a place to build the house," and "need[ed]" Jacobs.
            From the hotel, the defendant and the victim drove together in the victim's car to a wooded park in Easton, a drive reflected in the cell site location information and global positioning system data that tracked their cell phones' movements.  As they walked into the park, the victim stopped and put his head down and his hands at his sides, and the defendant shot him in the back of the head.  The defendant later told Jacobs that the defendant thought the victim knew he was going to be shot.
            After shooting the victim, the defendant drove away in the victim's car.  The defendant called Suarez and told her he had shot the victim.  He also told her in a text message that his partial fingerprint might be on the expelled shell casing, and that he had not "policed [his] brass," meaning he had not retrieved the casing.  Suarez directed the defendant to a friend's house in Rhode Island.  Suarez sent a text message to Jacobs:  "The house is done.  Please call [the victim's] phone ASAP!!!!  Now please."  The defendant used the victim's cell phone to send Jacobs a veiled text message purportedly from the victim himself.  Later, having regained access to his own cell phone, the defendant sent Jacobs additional messages, including one stating, "[I] finished my house."  The defendant also sent a text message to Suarez asking her to marry him, and she accepted.
            On his way to Rhode Island, the defendant dismantled the gun and scattered the pieces along the highway; it was never found.  Once in Rhode Island, he threw the victim's cell phone in a lake, where it was later recovered.
            The victim was found soon after the shooting by two boys biking in the woods.  He was breathing but unresponsive and died in the hospital two days later from the gunshot wound to his head.  The bullet had traveled from the back left side of his head, through his brain, and out the right side of his forehead.  A nine millimeter shell casing was found near his body.
            The defendant was arrested at a friend's house in South Carolina on November 12.  Police investigators found the victim's car at a motel in North Carolina, where they also found papers belonging to the defendant hidden behind a dresser.
            2.  Defenses at trial.  The defendant admitted to killing the victim.  He principally pursued a self-defense theory and also adduced evidence that he suffered from mental illness and was under the influence of both alcohol and cocaine at the time of the shooting.  The judge instructed the jury on self-defense, mental impairment, and voluntary intoxication.
            The defendant testified that the victim was violent and controlling, and that the defendant feared the victim's temper based on past instances of the victim's conduct towards the defendant, Suarez, and others.  One of these incidents, the defendant testified, occurred during their road trip from Florida to Massachusetts.  The victim, while driving and arguing with the defendant over the defendant's suspicions that the victim was stealing his money, pointed a gun at the defendant.  When the defendant pushed the gun to point it downwards, the gun went off and blew out a tire.  An expert testified that a hole in the mat and the floor frame of the front passenger's side of the victim's vehicle was consistent with a bullet hole.
            Regarding the events leading to the shooting, the defendant admitted sending many of the text messages on his cell phone but denied that the references to "building the house" were code for killing the victim.  The defendant testified that, when he reunited with the victim on November 7, 2016, the victim patted the defendant down, took the defendant's gun, and removed the battery and "SIM" card from the defendant's cell phone.  The defendant claimed that he did not intend to lure the victim to the park to shoot him; instead, it was the victim's idea to go to the park to drink.  Once in the park, the victim demanded the $7,000 check from the defendant and threatened him with a gun.  After a struggle during which the defendant wrestled the gun from the victim, the victim turned away and the defendant shot him in the back of the head.  The defendant testified that he thought that he was going to die during the altercation and had no choice but to shoot the victim.
            The defendant also testified regarding his physical disabilities resulting from motorcycle accidents and his decades of mental illness.  Fifty years old at the time of trial, the defendant had been diagnosed with schizoaffective disorder approximately thirty years earlier and had experienced "[h]earing voices, seeing things move that don't move, [and] seeing people . . . out of the corner of [his] eye that aren't there."  He also had been diagnosed with bipolar disorder when he was about eighteen years old, and his mood fluctuated among hyperactivity, anxiety, and depression.  He testified that he had been admitted to psychiatric hospitals twenty to thirty times, listing a number of specific facilities, and that he had last been hospitalized six to eight years before the shooting.  Over the years, he had been prescribed approximately forty different medications for his mental illnesses, including medication that alleviated his hallucinations.  Although he had been taking medication before the road trip, he ceased taking it after the victim threw it out of the window while they were driving on the highway, telling the defendant that he did not need it.
            The defendant also testified to an extensive history of substance use, including excessive use of alcohol and use of illegal drugs.  He testified that he "self-medicat[ed]" with drugs and alcohol, despite being aware of their adverse effect on his psychiatric disorders.  On the day of the shooting, he had consumed "[t]wo, three, four -- about ten shots of vodka" and also snorted cocaine.
            The defendant did not present medical records documenting any of his mental health diagnoses or past treatment, nor expert testimony regarding his mental state at the time of the offenses.  He did, however, elicit testimony from Suarez on cross-examination during the Commonwealth's case that he was "schizoaffective," had a seizure disorder, and had been taking medications for both conditions before the road trip to Massachusetts.
            3.  Procedural history.  After a twelve-day trial, on February 18, 2020, a jury convicted the defendant of all the charges against him, including murder in the first degree on theories of both deliberate premeditation and extreme atrocity or cruelty.  The judge sentenced the defendant to life imprisonment without the possibility of parole for the murder conviction, a consecutive term of from twenty-five years to life imprisonment for the armed robbery conviction, and a consecutive term of from fourteen to fifteen years for the conviction of larceny of a motor vehicle.[2]
            The defendant appealed from his convictions and subsequently filed a motion for a new trial, claiming violations of his right to effective assistance of counsel under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.  The judge who presided at the defendant's trial denied the motion for a new trial after an evidentiary hearing at which trial counsel was the sole witness.  The defendant's appeal from that order was consolidated with his direct appeal before this court.  This court thereafter remanded the defendant's motion for a new trial to the Superior Court for a further evidentiary hearing, because the record provided only limited insight into trial counsel's rationale for his decisions regarding the defendant's mental impairment defense; at the initial hearing, the defendant had invoked work product protection and attorney-client privilege with respect to matters that the defendant argued exceeded the scope of his ineffective assistance claims.  On remand, the same judge held a further evidentiary hearing over two days, at which the judge heard testimony from both trial counsel and a forensic psychologist with whom trial counsel had consulted.  After making further findings, the judge again denied the defendant's motion for a new trial, and the parties filed supplemental briefs in this court.
            Discussion.  We first address the defendant's claims of ineffective assistance of counsel and then turn to his claims of prosecutorial misconduct.
            1.  Ineffective assistance.  "'[A] motion for a new trial is addressed to the sound discretion of the trial judge,' who may grant a new trial 'if it appears that justice may not have been done.'"  Commonwealth v. Jacobs, 488 Mass. 597, 600 (2021), quoting Commonwealth v. Kolenovic, 471 Mass. 664, 672 (2015), S.C., 478 Mass. 189 (2017).  We review the judge's decision to determine whether there has been an abuse of discretion.  See Jacobs, supra.  Where a judge conducted an evidentiary hearing on the motion, we accept the judge's findings if supported by substantial evidence in the record and defer to the judge's assessment of witnesses' credibility.  See Commonwealth v. Tate, 490 Mass. 501, 505 (2022).  And "[w]here, as here, the motion judge is also the trial judge, we give 'special deference' to the judge's findings of fact and the ultimate decision on the motion."  Kolenovic, supra at 672-673, quoting Commonwealth v. Lane, 462 Mass. 591, 597 (2012).
            In reviewing a defendant's claim of ineffective assistance of counsel in a case of murder in the first degree, we do not evaluate the claim under the traditional standard set forth in Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).  See Commonwealth v. Gibson, 492 Mass. 559, 568 (2023).  "Instead, we apply the more favorable standard of G. L. c. 278, § 33E, and review the defendant's claim for a substantial likelihood of a miscarriage of justice."  Gibson, supra, citing Commonwealth v. Melendez, 490 Mass. 648, 657 (2022).  "Under this standard, 'we first ask whether defense counsel committed an error in the course of trial,' and if there was error, 'we ask whether it was likely to have influenced the jury's conclusion.'"  Gibson, supra, quoting Commonwealth v. Ayala, 481 Mass. 46, 62 (2018).  We consider the defendant's claim of ineffective assistance "even if the action by trial counsel does not constitute conduct 'falling measurably below that . . . of an ordinary fallible lawyer.'"  Commonwealth v. Salazar, 481 Mass. 105, 112 (2018), quoting Commonwealth v. Gonzalez, 443 Mass. 799, 808-809 (2005).
            The defendant raises two claims of ineffective assistance of counsel.  He first claims that trial counsel conducted insufficient investigation of medical, military, and Social Security disability insurance (SSDI) records that could have provided further corroboration, beyond the records counsel did obtain, of the defendant's testimony regarding his decades-long history of mental illness and treatment.  Second, the defendant claims that counsel provided ineffective assistance when counsel questioned the defendant on direct examination about his diagnoses and psychiatric treatment history without introducing any of the medical records that could have corroborated his testimony.  We discuss each claim in turn.
            a.  Failure to investigate.  We summarize the judge's findings, supplemented with undisputed facts from the record.  See Commonwealth v. Yat Fung Ng, 489 Mass. 242, 243-244 (2022), S.C., 491 Mass. 247 (2023).
            When the court appointed trial counsel in 2017, counsel learned from the defendant that he had a lengthy history of mental illness and treatment.  Counsel wrote to the defendant asking him for a list of his past medical providers and facilities where he had received treatment.  The defendant responded with a lengthy list.  The defendant also suggested that counsel obtain his SSDI records, because the defendant had been receiving SSDI benefits for many years and believed it would be "the most complete file from over 20 years."  Counsel also learned from the defendant that he had served in the military and received a medical discharge after a suicide attempt.
            Counsel and his assistant then made efforts to contact all the various providers and medical facilities that the defendant had listed, using a medical authorization release counsel obtained from the defendant.  Although counsel obtained records from some of the listed providers and facilities, certain facilities no longer existed; some records were no longer available due to their age; and many of the records counsel received related to medical treatment for physical ailments, as opposed to psychiatric treatment.  Counsel received at least some information about the defendant's suicide attempt while in the military and his subsequent military discharge, reflected in notes made by counsel or his assistant.  But counsel did not obtain copies of either the SSDI or military records, both of which later were obtained by the defendant's postconviction counsel.  Trial counsel's file for the defendant contained no correspondence or other evidence suggesting that counsel in fact had made efforts to request those particular records, and counsel had no recollection of why he did not seek them.  Trial counsel did obtain directly from providers at least some of the defendant's treatment records that were contained within the SSDI records.
            Trial counsel sent the records he had obtained to Dr. Fabian Saleh, a forensic psychologist, in 2018.  As reflected in counsel's notes of his ensuing conversation with Saleh, Saleh interviewed the defendant, reviewed the records, and then told counsel that he could not be helpful to the defense.  In Saleh's view, the records did not provide the basis for a criminal responsibility defense or a defense based on "battered syndrome" or posttraumatic stress disorder, though Saleh noted that the defendant did have a long history of substance abuse.  See generally Commonwealth v. Rezac, 494 Mass. 368, 371 (2024) (criminal responsibility defense); Commonwealth v. Rogers, 494 Mass. 629, 639-640 (2024) (mental impairment defense).
            In March 2019, counsel had a conversation with the defendant in which counsel learned that the defendant, while detained pending trial, was being treated with antipsychotic and antihallucinogenic medications, and that the defendant had not been taking those medications on the date of the offenses.  Counsel again contacted Saleh, to inquire whether Saleh potentially could be of assistance in light of this new information.  Saleh reaffirmed that he could not and instead suggested that counsel speak with someone else.  Saleh then returned the defendant's records to counsel.
            Counsel sought a continuance of the trial -- which had been scheduled to begin in May 2019 -- to investigate further the concerns raised by his conversation with the defendant.  A motion judge denied the request for a continuance, and counsel moved for reconsideration.  On reconsideration, the motion judge ordered that the defendant be evaluated for competency and criminal responsibility.
            Dr. Eric Brown interviewed the defendant in April 2019 and submitted a preliminary evaluation to the court under seal.  On the basis of the interview and an initial review of the defendant's records, Brown stated that the defendant had a long history of mental illness dating back to abuse and neglect he experienced during his childhood.  The evaluation detailed that the defendant had been psychiatrically hospitalized on numerous occasions and displayed signs of major mental illness for at least twenty years, including diagnoses of posttraumatic stress disorder; major depression with suicidal ideation and at least one suicide attempt resulting in his medical discharge from the military; and schizoaffective and bipolar disorders, with chronic auditory and visual hallucinations.  The defendant also used a cane or walker due to balance problems he attributed to head injuries that he sustained from motorcycle accidents, one of which had left him comatose for three days approximately eight years earlier.  Brown further stated that, based on the limited information available to him at the time, there was a reasonable possibility that the defendant might not be criminally responsible or capable of forming the specific intent required to commit the offenses with which he was charged.
            On the basis of Brown's preliminary evaluation, the motion judge granted the defendant's request for a continuance and also allowed funds for a further evaluation of the defendant by Brown.  Counsel sent Brown all the original records he had previously sent to Saleh.  Brown reviewed the voluminous records he was sent; interviewed the defendant again, this time at greater length; and also reviewed records relating to the charged offenses.
            Following Brown's more extensive review, Brown concluded and conveyed to counsel that he could not support a criminal responsibility defense, nor a defense that the defendant was affected by a major mental illness at the time of the offenses.  Brown wrote an e-mail message to counsel stating:
"I reviewed the medical records on [the defendant] and there does not appear to be strong evidence of major mental illness.  His psychological symptoms appear to be more related to substance abuse, anxiety and depression, and some aspects of a personality disorder which will not rise to the level of lack of criminal responsibility."
Counsel spoke with Brown by telephone after receiving this message.  The judge credited counsel's testimony that Brown then told counsel that he had gleaned information from the records suggestive of malingering, though Brown himself testified that he did not recall such evidence in the records.[3]
            Brown did not keep a list of the records he received from counsel.  Counsel never asked Brown at that time to return the defendant's records.  Brown, not realizing that he possessed counsel's sole copies of the records, shredded them in September 2020 when reorganizing his office.
            The judge concluded that the defendant had failed to show that trial counsel did not conduct an adequate investigation.  Counsel made efforts to obtain the psychiatric treatment records identified by the defendant and did obtain some of them, albeit not succeeding in obtaining all of them.  The judge found, in particular, that, notwithstanding the defendant's contention that counsel had failed to obtain records from Hackensack University Medical Center -- where the defendant had been psychiatrically hospitalized in 2010 -- counsel did obtain these Hackensack records, as counsel's assistant's notes reflected.  Moreover, although counsel did not obtain the defendant's SSDI or military records, counsel was aware of some of the information contained within those records; counsel had obtained some of the treatment records contained within the SSDI file from providers directly and knew that the defendant attempted suicide while in the military and was discharged for medical reasons.  And the judge found that, even if counsel did not review the defendant's pretrial treatment records from the Suffolk County house of correction that had been summonsed into court,[4] counsel was aware of much of the information in the Suffolk records.  With respect to the experts whom counsel consulted, the judge found that counsel had forwarded all the records he did obtain, including the Hackensack records, to each of the experts, and that, as evidenced by Brown's report following his preliminary evaluation of the defendant, Brown was aware of both the defendant's suicide attempt while in the military and the treatment the defendant was receiving at the Suffolk County house of correction at the time he examined the defendant.  Ultimately, the judge concluded that counsel had sufficient information about the substance of the defendant's treatment records to evaluate the strategic alternatives and make reasonable decisions in the defendant's best interests.
            The defendant now contends that counsel erred in failing to (1) obtain, review, or provide to Brown the Hackensack records of the defendant's 2010 psychiatric hospitalization, which corroborated the defendant's testimony that he had been hospitalized six to eight years prior to the time of the shooting; (2) obtain the defendant's SSDI and military records; or (3) review or provide Brown with the defendant's Suffolk records.  The defendant argues that, if counsel had sought and reviewed all of these records, he "presumably could have offered [them] at trial," and thereby "effectively rebutted the Commonwealth's attack on [the defendant's] credibility and supported the jury's consideration of mitigation pursuant to the trial [judge's] instructions on mental impairment."
            "Both the Massachusetts and Federal Constitutions require defense counsel 'to conduct an independent investigation of the facts.'"  Commonwealth v. Diaz Perez, 484 Mass. 69, 74 (2020), quoting Commonwealth v. Baker, 440 Mass. 519, 529 (2003), citing Strickland v. Washington, 466 U.S. 668, 690 (1984).  "The duty to investigate is one of the foundations of the effective assistance of counsel, because counsel's strategic decisions can be adequate only if counsel is sufficiently informed about the available options."  Commonwealth v. Long, 476 Mass. 526, 532 (2017).  "A duty to investigate a mental health defense 'arises when counsel is aware of information suggesting at least the viability of a [mental health] defense.'"  Commonwealth v. Velez, 487 Mass. 533, 548 (2021), quoting Commonwealth v. Holland, 476 Mass. 801, 807 (2017).  "Absent a reasonable investigation, defense counsel lacks sufficient information to evaluate his or her strategic options and to make decisions in the best interests of the client."  Diaz Perez, supra.  Where a defendant claims ineffective assistance of counsel on the ground that counsel's investigation was inadequate, the defendant "must identify with particularity how any investigation that counsel failed to conduct would have benefited the defense."  Commonwealth v. Shepherd, 493 Mass. 512, 536-537 (2024), citing Commonwealth v. Duran, 435 Mass. 97, 103 (2001).  "Speculation, without more, is not a sufficient basis to establish ineffective representation."  Shepherd, supra at 537, quoting Duran, supra.
            We conclude that the judge did not abuse his discretion in denying the motion for a new trial on the ground of inadequate investigation, because the claimed shortfalls in counsel's investigation do not create a substantial likelihood of a miscarriage of justice in the circumstances of this case.
            First, with respect to the Hackensack records, the defendant has failed to show any investigatory shortcoming at all.  The record supports the judge's factual finding that counsel did obtain and send to Saleh and Brown the Hackensack records, which corroborated the fact of the defendant's 2010 psychiatric hospitalization.  The judge had before him, among other evidence, counsel's letter to the facility requesting the records; counsel's assistant's notes marking the Hackensack records as "[r]eceived"; counsel's testimony that he sent both experts all the records he received; and Brown's testimony that he reviewed at least some psychiatric hospitalization records.
            Second, although counsel was unable to explain why he did not obtain the defendant's SSDI or military records, the defendant has not shown that, in light of the other records counsel gathered, obtaining the SSDI or military records would have better informed counsel in evaluating the strategic options and making decisions in the defendant's best interests.  See Diaz Perez, 484 Mass. at 74.  Counsel did obtain what Brown called a "ream" of records for the defendant from the providers and facilities the defendant had named, including records of psychiatric hospitalizations, and the defendant does not identify any distinct revelations in either the SSDI or military records.  As the judge found, the SSDI records partially duplicated the records that counsel did obtain and, consistent with those records, described psychiatric ailments including depression, anxiety, borderline personality disorder, bipolar disorder, and a seizure disorder, as well as the defendant's use of alcohol and drugs.  With respect to the military records, as the judge again found, counsel already was aware of the defendant's discharge following a suicide attempt and, in his investigation, obtained at least some confirmation of the event.  Cf. Velez, 487 Mass. 548-549 (counsel not ineffective for failing to obtain records documenting crisis interventions, where counsel obtained and provided expert witnesses with records documenting defendant's lengthy mental health history, psychiatric diagnoses, and medications administered).
            Third and similarly, with respect to the Suffolk records of the defendant's treatment while detained pending trial, even assuming counsel failed to obtain or review these records, see note 4, supra, the defendant has not shown that these records would have further informed his strategy.  As the judge found, counsel was already aware of much of the information in the records.  Indeed, after counsel learned from the defendant the medications that the defendant was being prescribed while detained, counsel contacted Saleh to consult him a second time; sought a continuance of trial; sought reconsideration when his motion for a continuance was denied; obtained a preliminary competency and criminal responsibility evaluation of the defendant; and eventually succeeded in obtaining a continuance of the trial and further evaluation by Brown.  In other words, counsel took action to reevaluate his strategy based on information he received regarding the defendant's treatment while detained.  Moreover, again, counsel had obtained and provided to Brown voluminous treatment records that, unlike the Suffolk records, predated the offenses and any motive to fabricate a defense.[5]  And, as with the SSDI and military records, the defendant has not identified information contained within the Suffolk records in the absence of which "counsel lack[ed] sufficient information to evaluate his . . . strategic options and to make decisions in the best interests of the client."  Diaz Perez, 484 Mass. at 74.
            And we cannot agree with the defendant's argument that counsel's failure to obtain these SSDI, military, and Suffolk records created a substantial likelihood of a miscarriage of justice because the records would have buttressed the defendant's credibility by corroborating his history of mental illness and psychiatric treatment and would have provided additional evidence for the jury to consider in support of his mental impairment defense.[6]  This argument rests on speculation, because the defendant has not shown that counsel would have introduced these records in evidence at trial even if he had obtained them.  As we discuss in greater detail in connection with the defendant's second claim of ineffective assistance, counsel made a strategic decision after consulting with two experts not to introduce any of the records he had obtained documenting the defendant's lengthy history of mental illness and psychiatric hospitalizations.  Counsel described this strategic decision as "steadfast":  "[I]n no way was I going to introduce those medical records."  Given the considerable overlap between the information contained in the unobtained records and the information already available to counsel, it is highly speculative to suggest that counsel would have altered his strategy if he had obtained the additional records, and, indeed, counsel did not testify that these records would have changed his strategy or that he would have introduced them at trial.  In the absence of such testimony, we decline to speculate ourselves.  See Shepherd, 493 Mass. at 537 & n.39, citing Commonwealth v. Rice, 441 Mass. 291, 304 (2004).
            Even if the additional records nonetheless could have made at least some further contribution to counsel's and his experts' understanding of the defendant's decades-long history of mental illness and addiction following a childhood of abuse and neglect, we still do not discern a substantial likelihood of a miscarriage of justice in the circumstances of this case.  There was overwhelming evidence that the defendant premeditated the killing, contrary to his claim that he acted in self-defense while under mental impairment.[7]  This evidence included text messages with Suarez in the two days leading up to the shooting in which the defendant discussed his plans to kill the victim, some of them sent in thinly veiled code and one of them accurately anticipating the timing of the shooting in the "next 24 hours"; testimony and corroborating text messages with Jacobs, to whom the defendant disclosed his animosity toward the victim and plan to kill him, and whom the defendant sought to enlist as a getaway driver; testimony from several witnesses establishing that the defendant obtained the murder weapon from Jacobs shortly after his rupture with the victim and began carrying it on his person; text messages showing the defendant attempting to lure the victim to meet him in a secluded location with the promise of a $2,000 check; and the defendant's deletion of incriminating text messages immediately before meeting the victim to execute his plan.
            The Commonwealth's cross-examination of the defendant further exposed the weakness of his claims of self-defense and mental impairment and undermined his credibility on grounds apart from the issue of the mental health records.  For example, the Commonwealth drew out the implausibility of the defendant's claim that references to "building the house" in his text messages merely referred to moving home to Suarez -- a claim Suarez herself contradicted, despite also testifying that she still loved the defendant at the time of trial and spoke with him daily.  The defendant further admitted to telling Suarez and Jacobs after the shooting that he had shot the victim in the back of the head and that, at the moment he fired the gun, the victim was looking down with his hands by his sides.  On this record, we are certain that obtaining the additional SSDI, military, and Suffolk records was not likely to have influenced the jury's conclusion.  See Gibson, 492 Mass. at 568.
            Thus, contrary to the defendant's argument, this is not a case like Commonwealth v. Alvarez, 433 Mass. 93, 93-98 (2000), in which this court upheld the allowance of a defendant's motion for a new trial where counsel had not obtained the defendant's medical records in full and thereby had compromised her criminal responsibility defense.  Alvarez bears a similarity to this case in that, there too, the Commonwealth had sought to undermine the defense by pointing to a lack of corroborating records.  Id. at 94-95, 98.  Unlike this case, however, in Alvarez an expert opined at trial that the defendant was not criminally responsible for her actions, and the unobtained records -- which established that the defendant did indeed suffer a serious brain injury, underwent extensive surgery, and was comatose and unresponsive for weeks -- would have supported the expert's opinion that the defendant's mental illness had an "organic" component of physical brain damage.  Id. at 99-100.  Here, by contrast, two experts informed counsel that they could not testify in support of the defendant's mental impairment defense, and the defendant is not claiming now that, with the benefit of the disputed records, an expert would have opined otherwise.
            We thus conclude that the judge did not abuse his discretion in denying the defendant's motion for a new trial on this claim.
            b.  Strategic decision.  We next turn to the defendant's second claim of ineffective assistance of counsel, relating to trial counsel's decision not to introduce any of the defendant's mental health records.  As described above, on direct examination counsel questioned the defendant about his history of mental illness, including his schizoaffective and bipolar diagnoses; the medications he had taken for those illnesses but was not taking at the time of the offenses; his history of alcohol and drug abuse, including at the time of the offenses; and his psychiatric hospitalizations.  Counsel did not, however, introduce any of the defendant's psychiatric treatment records.
            The Commonwealth's cross-examination of the defendant began with a series of questions focused on his lack of medical records to corroborate his testimony that he had been hospitalized for mental illness many times over the course of thirty years.  In the Commonwealth's closing argument, the prosecutor argued that the defendant's testimony was not credible in part because he failed to introduce any such corroborating records and instead provided only his own "self-serving" testimony and that of his girlfriend.  At the end of the closing argument, counsel objected to the prosecutor's reference to the defendant's failure to produce documentary evidence of his mental illness, arguing that the Commonwealth had improperly shifted the burden to the defense.  The judge then provided a curative instruction to the jury reminding them that the burden of proof was "always on the Commonwealth" and that the defendant did not have "the burden of bringing forward any evidence" or "any documents."
            At the evidentiary hearings on the motion for a new trial, counsel testified that his choice not to introduce the defendant's records was a strategic one.  Based on the expert opinions he had obtained from Saleh and Brown, counsel believed that the records showed that he "didn't have a legitimate defense of any mental defect, diminished capacity,[8] or criminal responsibility to raise," and that the records also suggested malingering.  He therefore did not want to disclose the medical records to the Commonwealth; he believed that the defendant had testified well and did not want the Commonwealth to use the records to undermine the effect of his testimony.  Counsel anticipated that the lack of corroborating records would be "fodder for cross-examination," but that he would have the opportunity to address the issue again on redirect and in closing.
            The judge credited this testimony from counsel that he made a strategic decision not to introduce any of the defendant's mental health records, because he was concerned the records would be useful to the Commonwealth's case.  The judge held that counsel's decision was not manifestly unreasonable in the circumstances.
            The defendant argues that it was manifestly unreasonable for counsel to question the defendant about his mental health history without introducing any records to corroborate the testimony, knowing that the Commonwealth would attack the defendant's credibility on this ground.  According to the defendant, introducing the records, by contrast, would have corroborated the defendant's testimony and also provided additional support for the mental impairment defense on which the judge instructed the jury.
            Where counsel has made a strategic or tactical decision, we apply "the more rigorous standard that, to be ineffective, the attorney's decision must have been manifestly unreasonable when made."  Velez, 487 Mass. at 540.  "Only strategy and tactics which lawyers of ordinary training and skill in criminal law would not consider competent are manifestly unreasonable."  Id., quoting Holland, 476 Mass. at 812.  We "make every effort . . . to eliminate the distorting effects of hindsight."  Velez, supra, quoting Holland, supra.
            The judge did not abuse his discretion in denying the defendant's motion for a new trial on this ground.  The record amply supports the judge's finding that counsel's decision not to introduce the defendant's records was a strategic one.  Where two experts had told counsel after reviewing the records that they could not testify in support of the defense, counsel evidently perceived the records as posing a "double-edged sword."  Commonwealth v. Vinton, 432 Mass. 180, 185 (2000).  Although the records would have corroborated the defendant's testimony, counsel also believed, based on the experts' opinions, that the records contained information damaging to the defense, including, according to Brown, evidence of malingering.  Faced with these circumstances, counsel chose not to introduce the records but to elicit at least some evidence of the defendant's schizoaffective and bipolar disorders, hallucinations, history of hospitalizations, and lack of medication at the time of the offenses through the defendant's and Suarez's testimony.
            We need not decide whether counsel's strategic decision was manifestly unreasonable because, in the circumstances of this case, the defendant cannot show that the decision created a substantial likelihood of a miscarriage of justice.  Counsel's strategic choices were constrained by the difficulty of defending this case.  As described above, there was overwhelming evidence that the defendant was angry with the victim, planned to kill him, obtained the murder weapon, lured the victim to meet him, and then shot him in the back of the head.  The defendant's testimony that he acted in self-defense and did not plan the killing in advance was discredited by the Commonwealth on numerous grounds, even aside from the lack of corroborating mental health records.  Moreover, with respect to the attack on the defendant's credibility based on the lack of corroborating medical records, counsel succeeded in obtaining a robust curative instruction from the judge after the Commonwealth's closing argument, reminding the jury that the defendant bore no burden of proof.  Following our close review of the entire record of this case, we conclude that counsel's strategic decision not to introduce records to corroborate the defendant's testimony about his mental health diagnoses and treatment history was not likely to have influenced the jury's conclusion.  See Gibson, 492 Mass. at 568.[9]
            2.  Prosecutorial misconduct.  We next address the defendant's claims that the prosecutor engaged in misconduct on cross-examination of the defendant and during her closing argument.
            a.  Cross-examination.  At trial the prosecutor began her cross-examination of the defendant by asking him where he had received psychiatric treatment.  The defendant named three hospitals, at which point the prosecutor asked the defendant the following questions:
Q.:  "And do you have any of these records supporting your claim that you have been hospitalized multiple times over a 30-year period?"
A.:  "No."
Q.:  "Those records would exist, you'd agree with me, correct?"
A.:  "They probably exist.  Medical doctors I think are required to keep your records for at least seven years.  So a lot of them may not.  But --"
Q.:  "In any event, you don't have any medical records to support your claim that you have been hospitalized many times, correct?"
A.:  "That's correct."
The defendant did not object to the questions.[10]  Citing Commonwealth v. Silanskas, 433 Mass. 678, 701 (2001), he now argues that these questions were improper because they commented on the defendant's failure to produce evidence.  We review for a substantial likelihood of a miscarriage of justice.  See Yat Fung Ng, 489 Mass. at 247.
            There was no such error, let alone an error creating a substantial likelihood of a miscarriage of justice.  In Silanskas, 433 Mass. at 700-701, this court held that it was improper for the prosecutor to comment in closing on the absence of psychiatric records regarding the victim, after counsel had referred to the records in questioning the medical examiner and an expert witness.  See id. at 701 ("the Commonwealth may not comment on the defendant's failure to produce evidence").
            Here, however, unlike in Silanskas, the questions occurred during the defendant's own testimony.  Having chosen to testify, the defendant was subject to "the ordinary rigors of proper cross-examination," Commonwealth v. McDermott, 493 Mass. 403, 412 (2024), quoting Commonwealth v. Rivera, 425 Mass. 633, 639 (1997), including questions suggesting his testimony was untrue, see Commonwealth v. Beauchamp, 424 Mass. 682, 691 (1997) (prosecutor may "impugn the defendant's credibility" and argue defendant's "story is a fabrication").  Accordingly, the prosecutor's questions were not improper.  Moreover, the jury were repeatedly and robustly instructed that the defendant bore no burden to produce any documents, dispelling any suggestion to the contrary from these questions.  See Silanskas, 433 Mass. at 702 ("We presume that the jury follow the judge's instructions").
            b.  Closing.  I.  Burden-shifting.  During the Commonwealth's closing argument, the prosecutor commented on the absence of the defendant's mental health records: 
"[A]ll we have, ladies and gentlemen, are the [d]efendant's self-serving statements that for 30 years, he suffered from schizoaffective disorder and from bipolar disorder.  Same from his girlfriend, Veronica Suarez.  Yet, he was unable to produce one single record to support the proposition that he was, in fact, suffering from any type of mental illness."
The defendant objected at the conclusion of the closing, and the judge then instructed the jury that "closing statements of the attorneys are not evidence," that the "burden of proof is always on the Commonwealth," and that the defendant "does not have the burden of producing any documents."
            The Commonwealth of course bears the burden of proof at a criminal trial, see Commonwealth v. Amirault, 404 Mass. 221, 240 (1989), and we have cautioned that "prosecutors should scrupulously avoid any statement that suggests that the defendant has any burden to produce evidence," Commonwealth v. Collazo, 481 Mass. 498, 503 (2019), quoting Commonwealth v. McMahon, 443 Mass. 409, 419 (2005).  The defendant argues that the Commonwealth's closing improperly shifted the burden of proof onto the defendant by referencing the defendant's failure to produce documentary evidence.[11]
            We conclude that the defendant was not prejudiced by any such error in the prosecutor's closing argument.  Viewed in the context of the entire closing, a reasonable jury would understand that the prosecutor sought to undermine the defendant's credibility and carry the Commonwealth's burden of proof.  See Commonwealth v. Gonzalez, 473 Mass. 415, 428 (2015).  Moreover, "[a]ny inference that the defendant had an obligation to [introduce corroborating evidence] was cured by the judge's instructions regarding the burden of proof, which made clear that the prosecutor bore the burden" and indeed specifically instructed the jury that the defendant did not bear the burden of producing any documents.  Id.
            ii.  Misstatement of evidence.  The defendant further claims that the Commonwealth's closing argument improperly argued facts not in evidence.  The prosecutor stated:
"Now you also heard testimony from Jacobs that there were several phone calls between the [d]efendant and Veronica Suarez that he was present for. . . .  [D]uring one of those phone calls, he heard the [d]efendant say to Veronica, 'If you want me to kill him, just say the word.'  And it was moments later that the [d]efendant said, done."
Jacobs did not in fact testify that he overheard the defendant tell Suarez, "If you want me to kill him, just say the word."  Instead, Jacobs's testimony was that he overheard the defendant say to Suarez that "[t]his has to be done. . . .  I promise, baby, it's going to get done."
            The defendant timely objected, and the judge provided a curative instruction to the jury.  The judge instructed that "the closing statements of the attorneys are not evidence," and that if an attorney says something "about what someone said or what a text said and your memory is different than what was said by an attorney, it is your memory that controls."
            "A prosecutor may not misstate evidence or refer to facts not in evidence during closing argument."  Commonwealth v. Robinson, 493 Mass. 775, 788 (2024).  Where a prosecutor does misstate evidence and the defendant timely objects, "the error is nonprejudicial only if we are 'sure that the error did not influence the jury, or had but very slight effect.'"  Commonwealth v. Tate, 486 Mass. 663, 669 (2021), quoting Commonwealth v. Alvarez, 480 Mass. 299, 305 (2018).  We consider the prosecutor's remarks "in the context of the whole . . . closing, as well as the entire case."  Commonwealth v. Alemany, 488 Mass. 499, 511 (2021).
            The specific comment Jacobs did attribute to the defendant in the overheard conversation -- that "it's going to get done" -- differed from the comment described by the prosecutor, expressly asking Suarez whether she wanted the defendant to "kill" the victim.  However, Jacobs also testified that he overheard the defendant speaking with Suarez two or three times "about killing [the victim]," and the evidence also included the defendant's numerous text messages with Jacobs and Suarez discussing his plan to kill the victim, including a text message to Suarez in which the defendant described Suarez as having given him "the green light."  Moreover, as discussed above, the evidence that the defendant planned to kill the victim was overwhelming.  In the context of the entire case, we are certain that the prosecutor's misstatement did not influence the jury.  See Tate, 486 Mass. at 669.
            3.  G. L. c. 278, § 33E.  We have reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E, and discern no basis to exercise our authority to reduce the verdict of murder in the first degree or grant a new trial.
            Conclusion.  The judge did not abuse his discretion in denying the defendant's motion for a new trial.  The claimed shortcomings in trial counsel's investigation of the defendant's mental health records did not create a substantial likelihood of a miscarriage of justice, nor did counsel's strategic decision to examine the defendant regarding his mental health diagnoses and treatment history without introducing in evidence the records counsel had obtained.  We discern no error in the prosecutor's questions on cross-examination about the defendant's lack of documentary evidence corroborating his history of psychiatric treatment, nor prejudice from any error in the prosecutor's related remarks in the Commonwealth's closing argument.  And, although the prosecutor made one misstatement of the evidence in the Commonwealth's closing argument, the error did not prejudice the defendant.  Following review of the whole record of the case under G. L. c. 278, § 33E, we affirm the judgments as to the convictions of murder in the first degree, armed robbery, and larceny of a motor vehicle, and we affirm the order denying the defendant's motion for a new trial.  We vacate the judgment as to the conviction of unlawful possession of a firearm, set aside that verdict, and remand for further proceedings consistent with Guardado, 493 Mass. at 2-3.
So ordered.
 
footnotes

 
            [1] Police investigators were able to recover almost all of the defendant's deleted text messages from his cell phone and also obtained the cell phones of Jacobs, Suarez, and the victim.  Although the victim's cell phone had been destroyed beyond examination, investigators were able to obtain his text messages and call data from his cell phone provider.
            [2] The defendant also received a sentence of from four to five years for the conviction of unlawful possession of a firearm that is to be vacated.
            [3] In his original findings of fact, the judge found that the defendant's records contained information potentially harmful to the defense, including an observation that the defendant "reported passive suicidal ideation every time the topic of discharge was brought up."  The judge found that this observation could have suggested to the jury that the defendant "is untruthful and willing to exaggerate his symptoms to achieve some ulterior goal."
            [4] In his postremand findings, the judge found both that counsel was "not aware of what was contained within" the Suffolk records at the time of trial, and that, although counsel could not recall reviewing the records, his normal custom and practice was to review medical records when they were summonsed into court.
            [5] As the judge noted, the Suffolk records contain a report that the defendant told a caregiver that the defendant was "[h]oping" his charge of murder in the first degree would be "dropped down to [a] lesser charge."
            [6] Deciding this case as we do, we need not decide whether there was error by trial counsel in the failure to obtain these records.
            [7] Cf. Rogers, 494 Mass. at 639-640 (jury may consider evidence of mental impairment at time of offense in determining whether Commonwealth proved specific intent necessary to commit offense); Yat Fung Ng, 489 Mass. at 253 (in case of deadly force, defendant entitled to self-defense instruction "where there is evidence warranting at least a reasonable doubt that he [1] had reasonable ground to believe and actually did believe that he was in imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force, [2] had availed himself of all proper means to avoid physical combat before resorting to the use of deadly force, and [3] used no more force than was reasonably necessary in all the circumstances of the case" [quotations and citation omitted]).
            [8] In the proceedings on the motion for a new trial, the mental impairment defense was sometimes referred to as "diminished capacity."  See Commonwealth v. Fratantonio, 495 Mass. 522, 526 n.2 (2025).
            [9] The defendant also contends that it was manifestly unreasonable for counsel to ask the defendant about his mental health history without having physical custody of the defendant's records in case counsel needed to introduce them; at the time of trial, Brown possessed the original records, and counsel had not retained a copy.  We discern no substantial likelihood of a miscarriage of justice on this claim not only for the reasons stated above, but also because, in light of the testimony of counsel credited by the judge, it is highly speculative to suggest that counsel would have used the records even if he had possessed them at trial.  See Shepherd, 493 Mass. at 537.
            [10] Contrary to the defendant's argument, trial counsel's later objection to the related portion of the Commonwealth's closing argument came too late to preserve the error.  See Commonwealth v. Watt, 493 Mass. 322, 335 (2024), quoting Commonwealth v. Morganti, 467 Mass. 96, 102-103, cert. denied, 574 U.S. 933 (2014) (defendant "must raise a claim of error at the first available opportunity" to avoid waiver).
            [11] The Commonwealth argues that this claim is subject to review only for a substantial likelihood of a miscarriage of justice on the ground that the defendant acquiesced in the judge's curative instruction.  See Commonwealth v. Beaudry 445 Mass. 577, 587 (2005).  We need not decide whether the claim was preserved, because we discern no prejudicial error.